## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BROOKE RYAN, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No: 5:20-cv-02164-JMG |
| v. | ) ) | |
| TEMPLE UNIVERSITY, | ) ) | |
| Defendant. | ) ) | |
| CHRISTINA FUSCA, on behalf of herself and all others similarly situated | ) ) ) ) | |
| Plaintiff, | ) ) | Case No: 2:20-cv-03434-JMG |
| v. | ) ) | |
| TEMPLE UNIVERSITY, | ) ) | |
| Defendant. | ) ) | |

### PLAINTIFFS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Brooke Ryan and Christina Fusca (collectively "Plaintiffs") by and through undersigned counsel, bring this action against Temple University ("Defendant" or the "University") on behalf of themselves and all others similarly situated, and make the following allegations based upon information, attorney investigation and belief, and upon Plaintiffs' own knowledge:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this case as a result of Defendant's decision not to issue appropriate refunds for the Spring 2020 semester after canceling in-person classes and changing all classes to an online/remote format, closing most campus buildings, and requiring all students who could leave campus to leave as a result of the Novel Coronavirus Disease ("COVID-19").

2.      This decision deprived Plaintiffs and the other members of the Classes from recognizing the benefits of on-campus enrollment, access to campus facilities, student activities, and other benefits and services in exchange for which they had already paid fees and tuition.

3.      Defendant has either refused to provide reimbursement for the tuition, fees and other costs paid in exchange for certain benefits that Defendant failed to provide during the Spring 2020 semester, or has provided inadequate and/or arbitrary reimbursement that does not fully compensate Plaintiffs and members of the Classes for their loss.

4.      This action seeks refunds of the amount Plaintiffs and other members of the Classes are owed on a *pro-rata* basis, together with other damages as pled herein.

## PARTIES

5.      Defendant Temple University is an institution of higher learning located in Philadelphia, Pennsylvania.

6.      Although Defendant receives annual, non-preferred financial appropriations from the Commonwealth of Pennsylvania in exchange for offering discounted tuition to in-state students, it is a separate legal entity, operating under its own charter and governed by a 36-member Board of Trustees.

7.      Through its Board of Trustees, Temple University manages its own assets, sets its own tuition and fees, directs its own fiscal policy, and otherwise is responsible for the acts and

omissions set forth in this Complaint.

8.      Defendant is not a part of the Pennsylvania State System of Higher Education and receives public appropriations accounting for less than 10% of its total operating budget.

9.      Upon information and belief, Defendant has an estimated endowment of approximately $642 Million.[1]

10.     Moreover, upon information and belief, Defendant received $14,370,189 in federal stimulus under the CARES Act.[2]  The CARES Act directs that approximately 14 billion dollars be distributed to colleges and universities based upon enrollment and requires that institutions must use at least half of the funds they receive to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to COVID-19.

11.     Although Defendant received this federal aid on April 11, 2020, and had already identified 25,262 of its students as qualified and eligible for aid, as of May 11, 2020, Defendant had distributed exactly $0 of the CARES Act money to its students.[3]

12.     Likewise, although the CARES Act requires Defendant to issue public reports related to its CARES Act spending every 45 days, as of the writing of this Complaint, Defendant does not appear to have made such a report since May 11, 2020, more than 75 days hence.

13.     Plaintiff Brooke Ryan is an individual and a resident and citizen of the Commonwealth of Pennsylvania.

14.     Plaintiff Christina Fusca is an individual and a resident and citizen of the Commonwealth of Pennsylvania.

15.     During the Spring 2020 semester, Plaintiff Brooke Ryan was enrolled as a full-time

---

[1] https://www.mcall.com/news/education/mc-nws-pennsylvania-college-endowments-20190131-story.html
[2] https://sfs.temple.edu/sites/sfs/files/documents/CARES%20act%20reporting.2020.06.18.pdf
[3] Id.

student in Defendant's undergraduate program.

16.     During the Spring 2020 semester, Plaintiff Christina Fusca was enrolled as a full-time student in Defendant's graduate program.

## JURISDICTION AND VENUE

17.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

18.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

19.     This Court has personal jurisdiction over Defendant because Defendant conducts business in Pennsylvania and has sufficient minimum contacts with Pennsylvania.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, where Defendant is primarily located.

## BACKGROUND FACTS

21.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

22.     Plaintiffs were enrolled as full-time students for the Spring 2020 academic semester at Defendant's institution.

23.     As a precondition for enrollment, Plaintiffs were required to and did pay substantial tuition for the Spring 2020 semester either out of pocket or by utilizing student loan financing, as did all members of the putative Tuition Class (defined below).

4

24.     There are hundreds, if not thousands, of institutions of higher learning in this country.

25.     Some institutions of higher learning provide curriculum and instruction that are offered on a remote basis through online programming which do not provide for physical attendance by the students.

26.     Defendant's institution offers both in-person, hands-on programs, and fully online distance-learning programs, which it markets and prices as separate and distinct products.

27.     Plaintiffs and members of the proposed Tuition Class did not choose to attend another institution of higher learning, or to seek an online degree, but instead chose to attend Defendant's institution and specifically chose the on-campus program offering and enrolled on that basis.

28.     Defendant has recognized and admitted the inherent difference between its in-person and online products, and markets them separately throughout its website and other publications and circulars, including its academic catalogs.

29.     Accordingly, when students pay tuition in exchange for enrollment in the on-campus program, such students expect to receive, and Defendant has promised to provide, benefits and services above and beyond basic academic instruction, which include but are not limited to:

- Face-to-face interaction with professors, mentors, and peers;

- Access to facilities such as computer labs, study rooms, laboratories, libraries, etc.;

- Student governance and student unions;

- Extra-curricular activities, groups, intramural sports, etc.;

- Student art, cultures, and other activities;

- Exposure to community members of diverse backgrounds, cultures, and schools of thought;

- Social development and independence;

- Hands-on learning and experimentation; and

- Networking and mentorship opportunities.

30.     Plaintiffs' education was changed from in-person, hands-on learning to online instruction during the Spring 2020 term.

31.     When this happened, Plaintiffs were forced from campus and deprived of the benefit of the bargain for which they had paid, and in exchange for which Defendant had accepted, tuition as set forth more fully above.

32.     In addition to tuition, Defendant charges certain mandatory fees, including but not limited to a mandatory University Services Fee.

33.     According to the Bursar's Office, this comprehensive fee is intended to cover, among other things:[4]

  a. Funding for state-of-the art computer equipment and technologies to provide support for the students' academic experiences, including e-amil access and modern lab facilities;

  b. Access to all student activities, events, and recreational facilities;

  c. Expansion and maintenance of recreational and academic facilities to enhance and improve student life; and

  d. Availability of basic student health and treatment services provided by nurses and physicians on campus.

---

[4] Id.

34.     As a result of being instructed to stay off campus for the latter portion of the Spring 2020 semester, Plaintiffs and members of the Fees Class lost the benefit of the services for which these fees had been paid.  For example, Plaintiffs and the Class could not access the computer labs or recreational facilities; could not participate in student activities and events; and were not able to seek basic on-campus health and treatment services.

35.     In addition to the broad-based mandatory fees described above, Defendant charges a myriad of other program or course specific fees.

36.     Plaintiffs and members of the Classes paid the Mandatory Fees associated with their Spring 2020 enrollment so that they could benefit from on-campus activities, events, recreational facilities, lab facilities, and health and treatments services "on campus."

37.     Members of the Classes have demanded the return and/or future discount of the prorated portion of tuition and Mandatory Fees, and have taken to online petitions to demand the same.[5]

38.     Despite the demand from members of the Class, the University has not provided any refund of the tuition and Mandatory Fees, and continues to retain the monies paid by Plaintiffs and members of the Classes.

## FACTUAL ALLEGATIONS

39.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

40.     Upon information and belief, Defendant's Spring term began with the first day of classes on or about January 13, 2020.[6]

---

[5] https://www.change.org/p/temple-university-temple-university-partial-tuition-reimbursement;
https://www.change.org/p/temple-university-lower-temple-university-fall-2020-tuition?signed=true.
[6] https://www.temple.edu/registrar/documents/calendars/19-20.asp

41.     Upon information and belief, Defendant's Spring term was scheduled to conclude with the last day of examinations on or about May 5, 2020 and commencement ceremonies on May 7, 2020.[7]

42.     Accordingly, Defendant's Spring semester was scheduled and contracted to consist of approximately 113 days.

43.     However, as a result of the COVID-19 pandemic, Defendant announced on March 11, 2020 that it was moving all classes online for the remainder of the semester, effective March 16, 2020.[8]

44.     In the same announcement, students (both those living on and off campus) were asked to return to their permanent homes through the end of the semester.[9]

45.     Based on the dates set forth above, upon information and belief, Defendant's move to online classes and constructive eviction of students on March 16, 2020 deprived Plaintiffs and other members of the Classes from access to campus facilities and in-person instruction for approximately 45% of the semester for which they had contracted.

46.     In the March 11, 2020 announcement to students, President Englert and Provost Epps conceded that this would be a "difficult" and "significant transition" but stated, "We promise to work diligently with the university community in the days to come to help make this transition as smooth as possible for everyone."[10]

47.     Unfortunately, nothing could have been further from the truth.

48.     Although Defendant continued to offer some level of academic instruction via

---

[7] Id.
[8] https://news.temple.edu/announcements/2020-03-11/covid-19-update-temple-university-classes-move-fully-online-and-alternative
[9] Id.
[10] Id.

online classes, Plaintiffs and members of the proposed Tuition Class were deprived of the benefits of on-campus enrollment for which they paid as set forth more fully above.

49.     These realities notwithstanding, Defendant has refused and continues to refuse to offer any refund whatsoever with respect to the tuition that had already been pre-paid.

50.     In recognition that there is a decrease in benefit being provided to the students, the University implemented a tuition freeze for the Fall 2020 semester. [11]

51.     In tacit acknowledgment that the tuition freeze is not enough, and that tuition should be lower for online distance learning, Vice President, Chief Financial Officer, and Treasurer of the University, Ken Kaiser, stated "We would love to discount the tuition [but a freeze] was all we thought we could afford while still keeping the university financially viable."[12]

52.     Likewise, Plaintiffs and members of the proposed Fees Class were deprived of utilizing services for which they have already paid, such as access to campus facilities, student activities, health services and other opportunities.

53.     Nonetheless, Defendant has also refused and continues to refuse to offer any refund whatsoever with respect to the fees that had already been pre-paid.

54.     Defendant has announced that it will be issuing full *pro-rata* refunds for room and board fees.  Accordingly, this action does not seek to certify an On-Campus Housing Class or Meals Class for the recovery of those funds.  However, Plaintiffs reserve the right to amend these allegations should Defendant fail or refuse to issue these refunds as promised.

## CLASS ACTION ALLEGATIONS

55.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth

---

[11] https://news.temple.edu/news/2020-07-13/frequently-asked-questions-about-temple-s-tuition?utm_source=social&utm_medium=Twitter&utm_content=TuitionFAQs&utm_campaign=SocialMedia2020&sf125275000=1
[12] *Id.*

herein.

56.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Classes:

> **The Tuition Class:**
>
> All people who paid tuition for or on behalf of students enrolled in class(es) at the University for the Spring 2020 semester but were denied live, in-person instruction and forced to use online distance learning platforms for the latter portion of that semester.
>
> **The Fees Class:**
>
> All people who paid fees for or on behalf of students enrolled in class(es) at the University for the Spring 2020 semester.

57.     Excluded from the Classes are the Temple University Board of Trustees, and any of their respective members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the judicial officers, and their immediate family members, and Court staff assigned to this case.  Plaintiffs reserve the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.

58.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

59.     This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Federal Rule of Civil Procedure 23.

**Numerosity: Fed. R. Civ. P. 23(a)(1)**

60.     The members of the Classes are so numerous and geographically dispersed that individual joinder of all members is impracticable.  Plaintiffs are informed and believe that there

are thousands of members of the Classes. Although the precise number of Class members is unknown to Plaintiffs, the University is reported as having more than 39,000 students enrolled for the 2019-2020 academic year.[13] Members of the Classes may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

**Commonality and Predominance: Fed. R. Civ. P. 23(a)(2)**

61.     This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

    i.   Whether Defendant engaged in the conduct alleged herein;

    ii.  Whether there is a difference in benefit provided for enrollment in an online distance learning program as compared to enrollment in a live, on-campus instructional program;

    iii. Whether Defendant breached its contracts with Plaintiffs and the other members of the Tuition Class by retaining the portion of their tuition representing the reduction in benefit provided through online distance learning as compared to on-campus, in-person enrollment;

    iv.  Whether Defendant was unjustly enriched by retaining tuition payments of Plaintiffs and the Tuition Class representing the reduction in benefit of online distance learning as compared to on-campus, in-person enrollment;

    v.   Whether Defendant breached its contracts with Plaintiffs and the other members of the Fees Class by retaining fees without providing the services, benefits and/or programs the fees were contracted to cover;

---

[13] https://www.temple.edu/ira/documents/data-analysis/at-a-glance/Temple-At-a-Glance-2019-2020.pdf.

vi. Whether Defendant was unjustly enriched by retaining fees of Plaintiffs and the other members of the Fees Class without providing the services, benefits and/or programs the fees were intended to cover;

vii. Whether certification of any or all of the classes proposed herein is appropriate under Fed. R. Civ. P. 23;

viii. Whether Class members are entitled to declaratory, equitable, or injunctive relief, and/or other relief; and

ix. The amount and nature of relief to be awarded to Plaintiffs and the other members of the Classes.

**Typicality: Fed. R. Civ. P. 23(a)(3)**

62.     Plaintiffs' claims are typical of the claims of other members of the Classes because, among other things, all such members were similarly situated and were comparably injured through Defendant's wrongful conduct as set forth herein.

**Adequacy: Fed. R. Civ. P. 23(a)(4)**

63.     Plaintiffs are adequate representatives for the Classes because their interests do not conflict with the interests of other members of the Classes she seeks to represent.  Plaintiffs have retained counsel competent and experienced in complex litigation and Plaintiffs intend to prosecute the action vigorously.  The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

**Superiority: Fed. R. Civ. P. 23(b)(3)**

64.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs

and other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Classes to individually seek redress for Defendant's wrongful conduct.

65.     Even if members of the Classes could afford individual litigation, the Court system likely could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, comprehensive supervision by a single court, and finality of the litigation.

**Certification of Specific Issues: Fed. R. Civ. P. 23(c)(4)**

66.     To the extent that any described Class herein does not meet the requirements of Rules 23(b)(2) or (b)(3), Plaintiffs seek the certification of issues that will drive the litigation toward resolution.

**Declaratory and Injunctive Relief: Fed. R. Civ. P. 23(b)(2)**

67.     Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described herein, with respect to the members of the Classes as a whole.

**FOR A FIRST COLLECTIVE CAUSE OF ACTION**
**BREACH OF CONTRACT**

**(Plaintiffs and Other Members of the Tuition Class)**

68.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

69.     Plaintiffs bring this count on behalf of themselves and other members of the Tuition

13

Class.

70.     Plaintiffs and the other members of the Tuition Class entered into contracts with Defendant which provided that Plaintiffs and other members of the Tuition Class would pay tuition for or on behalf of students and, in exchange, Defendant would enroll such students and admit them to campus; granting them the full rights and privileges of student status, including but not limited to access to campus facilities, access to campus activities, and live, in-person instruction in a physical classroom.

71.     The terms of this contract are as implied or set forth by Defendant through its website, academic catalogs, student handbooks, marketing materials and other circulars, bulletins, and publications.

72.     These rights and privileges form the basis of the bargain on which prospective students agree to accept Defendant's offer of enrollment in exchange for the payment of tuition and fees.

73.     One such right is the ability to be physically present on campus, and fully enjoy the facilities, services, and opportunities provided thereon.

74.     This is so axiomatic and engrained into the culture of higher education generally and Temple specifically that it is enshrined within Defendant's mission statement which reads:[14]

---

[14] https://bulletin.temple.edu/undergraduate/about-temple-university/  See, also, https://www.temple.edu/about

## MISSION STATEMENT

Opportunity. Engagement. Discovery.

Temple University educates a vibrant student body and creates new knowledge through innovative teaching, research and other creative endeavors. Our urban setting provides transformative opportunities for engaged scholarship, experiential learning, and discovery of self, others and the world. We open our doors to a diverse community of learners and scholars who strive to make the possible real.

We are committed to the ideals upon which Temple was founded:

- providing access to an excellent, affordable higher education that prepares students for careers, further learning and active citizenship.
- creating a collaborative community of outstanding faculty and staff who foster inclusion and encourage the aspirations of Temple students.
- promoting service and engagement throughout Philadelphia, the Commonwealth of Pennsylvania, the nation and the world.

75.    Defendant's website and recruitment brochures are the primary means through which Defendant targets prospective new students and attempts to influence such students to apply for enrollment at the University as opposed to other institutions of higher learning.

76.    Through these publications, Defendant markets to and enrolls students in two separate and distinct products.

77.    Defendant specifically markets certain classes and degree programs as being offered on a fully online basis.

78.    Indeed, Defendant dedicates an entire section of its website to these programs, which can be accessed at www.online.temple.edu.

79.    Conversely, Defendant's publications with respect to non-online classes are full of references to the on-campus experience, including numerous references to student activities; campus amenities; class size and student/teacher ratios; campus diversity, campus location, and the like.

80.    On its website, the University repeatedly markets its on-campus experience as a

benefit of enrollment[15]:

## Main Campus

Located close to the heart of central Philadelphia, our Main Campus pulses with vibrant energy thanks to numerous new building projects and the 11,000 students living on or around campus. Outside of class, students choose from a diverse range of activities on campus and in the surrounding city. Temple has more than 300 student organizations, Division I sporting events, and over 1,000 arts and music events on campus each year. Take the Broad Street line a few stops south to find yourself in the center of Philadelphia's thriving food and restaurant scene, shopping districts, museums, galleries and cultural venues. Proximity to downtown Philadelphia affords Temple students the excitement of a big city without giving up the close-knit feel of a traditional campus setting.



### Life at Temple

You will never be bored at Temple. On a daily basis, you can choose from an eclectic array of cultural, athletic and social activities, such as student-run clubs, community-service projects, athletic events and musical performances.

These activities aren't simply time fillers. They're also opportunities to meet fellow students and expand your personal and professional networks.

81.     Defendant's 2019 academic catalog opens with a section entitled, "About Temple University" in which Defendant boasts:

> Temple's bustling Main Campus is set against the backdrop of the Philadelphia skyline. Green space, athletic facilities and eclectic architecture ranging from the historic Temple Performing Arts Center to an emerging state-of-the-art Charles Library form a vibrant residential setting. Temple's NCAA Division I athletic programs and hundreds of student organizations thrive on campus.[16]

82.     This publication goes on to claim that "investments in the campus learning environment have elevated the university's capabilities across its 17 schools and colleges with

---

[15] https://admissions.temple.edu/about/our-campuses. See also, https://www.temple.edu/life-at-temple.
[16] Id.

impressive results" offering students "a dynamic and nurturing learning environment with the support of a renowned faculty…"[17]

83.     Here, prospective students are encouraged to learn more about Defendant's "Visualize Temple" campus plan to see how Defendant is "investing millions of dollars into new and upgraded facilities" as their "vibrant residential campus continues to evolve, with exciting new academic and recreation spaces, as well as significant renovations and upgrades."[18]

84.     Defendant's website is similarly descriptive.

85.     When visitors enter the "Life at Temple" page on Defendant's main website (https://www.temple.edu/life-at-temple), they are greeted with the following promises, among others:

> Arts and culture are alive at Temple. Nearly every day brings theater and dance performances, concerts, art exhibits and visiting lecturers. And that's just on campus. Thanks to our location in Philadelphia, you also have easy access to the city's world-class museums, art galleries and performing arts venues.
>
> Temple is home to hundreds of student-run clubs and organizations covering a wide variety of personal and professional interests. Each gives you the chance to become involved in campus life and connect with students who have similar interests.
>
> Your college experience includes more than just academics. When not in class or hitting the books, be sure to take advantage of our impressive selection of health, fitness and recreation options, including world-class gyms and a comprehensive student health center.
>
> When you come to Temple, you also come to Philadelphia—one of the nation's most diverse and vibrant cities. Here, you'll find a hotbed of nightlife, culture, entertainment and cuisine, just minutes from campus.

---

[17] Id.
[18] Id.

86.     Students seeking further information about the University can connect to Defendant through its numerous official social media accounts.

87.     Upon information and belief, there were no references or disclaimers in any of Defendant's websites, circulars, bulletins, publications, brochures, or other advertisements that even referenced the possibility of in-person classes being changed to fully online classes for any reason whatsoever after the start of a given term.

88.     In fact, it is clear that, prior to the COVID-19 interruption, Defendant had no plans whatsoever to offer its in-person classes via an online delivery model.  This is evident from the fact that the University had to hurriedly and ineffectively scramble to make the switch, while acknowledging the "significance" and "difficulty" of the change.[19]

89.     Based upon these advertisements and other promises and inducements made by Defendant, those prospective students who were interested in enrolling at the University after consuming the marketing materials described above were invited to complete applications, and some were selected for and offered admission.

90.     When a student is offered admission to the University, that student receives a number of further communications and has a number of additional interactions with Defendant.

91.     Initially, the student will receive an official offer letter.  For example, at least one version of Defendant's acceptance letter read, "as you consider the college choices available to you, I hope you will consider that Temple offers the educational excellence, personalized attention and rich campus life that is right for you" before concluding, "our students, faculty and staff look forward to welcoming you to campus."

92.     According to Defendant's publications, "accepting your offer of admission is the

---

[19] https://news.temple.edu/announcements/2020-03-11/covid-19-update-temple-university-classes-move-fully-online-and-alternative

first step to officially joining the Temple community."[20]

93.     Accepted students, and their families, are invited to attend "Experience Temple Day" an admitted students' day (which is hosted on Defendant's campus) where Defendant again attempts to convince such students to accept their offers of admission by highlighting the University's location and the many benefits of being on campus.

94.     During this time, prospective students are again given a tour of campus and have the opportunity to hear from faculty and current students about all the benefits Temple's location has to offer.

95.     When students officially accept their offers, they are flooded with a number of other communications from the school each again referencing the Temple "community" and extolling the virtues of the on-campus experience.

96.     Before the start of their first semester, students are required to attend a mandatory new student orientation program on-campus.

97.     Once students make it through orientation [and for returning students], it comes time to register for classes.  This is another area where Defendant specifically emphasizes the distinction between its in-person and online class offerings through the academic catalogs and course listings on the website.

98.     Each of Defendant's academic programs is listed separately on the University's student financial services website with the specific tuition and fees charged for the specific program.

99.     That website is found at https://bulletin.temple.edu/undergraduate/tuition-fees/.

100.    Each online program is specifically delineated as such, with the in-person programs

---

[20] https://admissions.temple.edu/apply/admitted-students

not so delineated.

101.   Likewise, the programs are priced differently, with the online programs offered at up to a 45% discount from their on-campus equivalent.

102.   When students log on to their TUportal account during the registration period to select their in-person classes, each class is listed not only by description, but also by meeting time and physical classroom location.

103.   Upon registration, students in many of Defendant's on-campus schools and programs were subject to strict personal attendance requirements as set forth in various departmental policies and handbooks, evidencing Defendant's requirement and the student's acceptance of the requirement that such students physically attend such classes on campus.

104.   The Defendant offered to provide, and members of the Tuition Class expected to receive, instruction on the physical campus is further evidenced by the parties' prior course of conduct.

105.   Those classes for which students expected to receive in-person instruction began in the Spring 2020 semester by offering in-person instruction.

106.   Each day for the weeks and months leading up to March 16, 2020, students attended physical classrooms to receive in-person instruction, and Defendant provided such in-person instruction.

107.   Likewise, upon information and belief, most students were provided with syllabi and other documents that referenced class meeting schedules, locations, and physical attendance requirements.

108.   Each day for the weeks and months prior to announced closures, students had access to the full campus.

109.    Accordingly, it is clear that Defendant offered to provide live, in-person education, together with a full on-campus experience and that members of the Tuition Class accepted that offer by paying tuition and attending classes during the beginning of the Spring 2020 semester.

110.    It is also clear that Defendant recognized and treated online enrollment vs. on-campus enrollment as two separate and distinct products.

111.    In addition to maintaining separate websites and charging differing tuition prices, Defendant published a separate course catalog for online course.

112.    Likewise, Defendant differentiated the two products in many of its official policies as published in the Policy and Procedures Manual, including but not limited to its Course Syllabi Policy (no. 02.78.13), its Presidential Policy on Faculty Office Hours (no. 02.78.12), its Credit Hours Policy (no. 02.10.19) and its General Education Curriculum and Implementation Policy (no. 02.10.03).

113.    Based on this mutual assent, Plaintiffs and other members of the Tuition Class fulfilled their end of the bargain when they paid tuition for the Spring 2020 semester, either by paying out of pocket or by using student loan financing, or otherwise.

114.    However, the University breached the contract with Plaintiffs and other members of the Tuition Class by moving all classes for the Spring 2020 semester to online distance learning platforms, and eliminating the on-campus experience without reducing or refunding tuition accordingly.

115.    This cause of action does not seek to allege "academic malpractice."

116.    Rather, it is clear from the facts and circumstances that Defendant offered two separate and distinct products, one being live, in-person, on-campus education, with its featured ancillary and related services, and the other being online distance education.

117.    Plaintiffs and members of the Tuition Class accepted Defendant's offer for live in-person on-campus education and paid valuable consideration in exchange.

118.    However, after accepting such consideration from Plaintiffs and other members of the Tuition Class, Defendant provided a materially different product, which deprived Plaintiffs and other members of the Tuition Class of the benefit of the bargain for which they had already paid.

119.    Defendant retained tuition monies paid by Plaintiffs and other members of the Tuition Class, without providing them the full benefit of their bargain.

120.    Plaintiffs and other members of the Tuition Class have suffered damage as a direct and proximate result of Defendant's breach amounting to the difference in the fair market value of the services and access for which they contracted, and the services and access which they actually received.

121.    As a direct and proximate result of Defendant's breach, Plaintiffs and other members of the Tuition Class are legally and equitably entitled to damages, to be decided by the trier of fact in this action, to include disgorgement of the difference between the fair market value of the online learning provided versus the fair market value of the live, in-person instruction in a physical classroom on a physical campus with all the attendant benefits for which they contracted.

**FOR A SECOND COLLECTIVE CAUSE OF ACTION**
**UNJUST ENRICHMENT**

**(Plaintiffs and Other Members of the Tuition Class)**

122.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

123.    Plaintiffs bring this count on behalf of themselves and other members of the Tuition Class.

124.    This claim is pled in the alternative to, and to the extent it is determined a contract does not exist or otherwise apply, the contract-based claim set forth in the First Cause of Action above.

125.    Plaintiffs and other members of the Tuition Class paid substantial tuition for live, in-person instruction in physical classrooms on a physical campus with all the attendant benefits.

126.    Plaintiffs and other members of the Tuition Class conferred a benefit on Defendant when they paid this tuition.

127.    Defendant has realized this benefit by accepting such payment.

128.    However, Plaintiffs and other members of the Tuition Class did not receive the full benefit of their bargain.

129.    Instead, Plaintiffs and other members of the Tuition Class conferred this benefit on Defendant in expectation of receiving one product, *i.e.*, live in-person instruction in a physical classroom along with the on-campus experience of campus life as described more fully above, but they were provided with a materially different product carrying a different fair market value, *i.e.*, online instruction devoid of the on-campus experience, access, and services.

130.    Defendant has retained this benefit, even though Defendant has failed to provide the services for which the tuition was collected, making Defendant's retention unjust under the circumstances.

131.    As a result of closing campus and moving classes online, Defendant saved significant sums of money in the way of reduced utility costs, reduced maintenance and staffing requirements, reduced or eliminated hours for hourly employees, reduced or eliminated hours for paid work study students, and otherwise.

132.    Simply put, it is significantly cheaper to operate a remote, on-line campus than a

fully open physical campus.  But even if it was not, it is not the product that students were offered and not the product the students expected to receive.

133.    Equity and good conscience require that the University return a portion of the monies paid in tuition to Plaintiffs and other members of the Tuition Class.

134.    This is particularly true where, as here, Defendant is supported by a $624 million endowment, while its students on information and belief, do not have access to such immense financial resources, and further where, on information and belief, a substantial portion of its students have incurred substantial debt to finance an educational experience that they did not receive.

135.    At the same time, Defendant received significant aid from the federal government, of which Defendant has failed to pass any along to students.

136.    Defendant should be required to disgorge this unjust enrichment to the extent that Defendant has retained more than the fair market value for the product that Defendant was able to provide.

**FOR A THIRD COLLECTIVE CAUSE OF ACTION
BREACH OF CONTRACT**

**<u>(Plaintiffs and Other Members of the Fees Class)</u>**

137.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

138.    Plaintiffs bring this count on behalf of themselves and other members of the Fees Class.

139.    In addition to tuition, Defendant charges a mandatory, campus-wide fee.

140.    In its publications and, particularly on its website, Defendant specifically describes the nature and purpose of the fee.

141.    As such, it is axiomatic that the monies Plaintiffs and other members of the Fees Class paid towards this fee were intended by both the students and Defendant to cover the services for which the fee was described and billed.

142.    Pursuant to Defendant's publications, the comprehensive fee is intended to cover:[21]

      a.  Funding for state-of-the art computer equipment and modern lab facilities;

      b.  Access to all student activities, events, and recreational facilities; and

      c.  Availability of basic student health and treatment services provided by nurses and physicians on campus.

143.    As such, in accepting these terms and paying this fee, a contract was formed between Plaintiff, including the Fees Class, and Defendant, which provided that Plaintiffs and other members of the Fees Class would pay this fee for or on behalf of themselves and, in exchange, Defendant would provide or make available the services, benefits and/or programs related to those fees, as promised.

144.    It is undisputed that Defendant did not provide student activities, on-campus computer or lab facilities, access to recreational facilities, access to campus events, any student activities, or any student health and treatment services for a portion of the Spring 2020 semester.

145.    Plaintiffs and other members of the Fees Class fulfilled their end of the bargain when they paid these fees for the Spring 2020 semester, either by paying out of pocket or by using student loan financing, or otherwise.

146.    However, Defendant breached the contract with Plaintiffs and other members of the Fees Class by moving all classes for the Spring 2020 semester to online distance learning

---

[21] Id.

platforms, constructively evicting students from campus, closing most campus buildings and facilities, and cancelling most student activities.

147.    By retaining fees paid by Plaintiffs and other members of the Fees Class, without providing them the full benefit of their bargain, Defendant has not performed its contractual obligations.

148.    Plaintiffs and other members of the Fees Class have suffered damage as a direct and proximate result of Defendant's breach, namely being deprived of the value of the benefits, services and/or programs the fees were intended to cover.

149.    As a direct and proximate result of Defendant's breach, Plaintiffs and other members of the Fees Class are legally and equitably entitled to damages, to be decided by the trier of fact in this action, to include disgorgement of the pro-rata amount of fees that were collected but for which services were not provided.

### FOR A FOURTH COLLECTIVE CAUSE OF ACTION
### UNJUST ENRICHMENT

### (Plaintiffs and Other Members of the Fees Class)

150.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

151.    Plaintiffs bring this count on behalf of themselves and other members of the Fees Class.

152.    This claim is pled in the alternative to, and to the extent it is determined a contract does not exist or otherwise apply, the contract-based claim set forth in the Third Cause of Action above.

153.    Defendant has received a benefit at the expense of Plaintiffs and other members of the Fees Class to which it is not entitled.

154.    Plaintiffs and other members of the Fees Class paid substantial student fees for on-campus benefits, access and services and did not receive the full benefit of the bargain.

155.    Plaintiffs and other members of the Fees Class conferred this benefit on Defendant when they paid the fees.

156.    Defendant realized this benefit by accepting such payment.

157.    Defendant has retained this benefit, even though Defendant has failed to provide the services, benefits and/or programs for which the fees were collected, making Defendant's retention unjust under the circumstances.

158.    As a result of closing campus and moving classes online, Defendant saved significant sums of money in the way of reduced utility costs, reduced maintenance and staffing requirements, reduced or eliminated hours for hourly employees, reduced or eliminated hours for paid work study students, and otherwise.

159.    Simply put, it is significantly cheaper to operate a remote, on-line campus than a fully open physical campus.

160.    Equity and good conscience require that Defendant return a *pro-rata* portion of the monies paid in fees to Plaintiffs and other members of the Fees Class.

161.    This is particularly true where, as here, Defendant is supported by a $624 million endowment, while its students on information and belief, do not have access to such immense financial resources, and further where, on information and belief, a substantial portion of its students have incurred substantial debt to finance an educational experience that they did not receive.

162.    At the same time, Defendant received significant aid from the federal government, of which Defendant has failed to pass any along to students.

163.    Defendant should be required to disgorge this unjust enrichment to the extent that Defendant has retained more than the fair market value for the product that Defendant was able to provide.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of members of the Classes, pray for judgment in their favor and against Defendant as follows:

A.    Certifying the Classes as proposed herein, designating Plaintiffs as Class representatives, and appointing undersigned counsel as Class Counsel;

B.    Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this action;

C.    Declaring that Defendant has wrongfully kept monies paid for tuition and fees;

D.    Requiring that Defendant disgorge amounts wrongfully obtained for tuition and fees;

E.    Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from retaining the pro-rated, unused monies paid for tuition and fees;

F.    Scheduling a trial by jury in this action;

G.    Awarding Plaintiffs' reasonable attorney's fees, costs and expenses, as permitted by law;

H.     Awarding pre and post-judgment interest on any amounts awarded, as permitted by law; and

I.    Awarding such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury

in this action of all issues so triable.

Dated September 4, 2020

**CARPEY LAW, P.C.**

*/s/ Stuart A. Carpey*
Stuart A. Carpey, #49490
600 W. Germantown Pike, Suite 400
Plymouth Meeting, PA 19462
(610) 834-6030
scarpey@carpeylaw.com

-and-

**ANASTOPOULO LAW FIRM, LLC**

*/s/ Eric M. Poulin*
Eric M. Poulin**
Roy T. Willey, IV **
32 Ann Street
Charleston, SC 29403
(843) 614-8888
eric@akimlawfirm.com
roy@akimlawfirm.com

-and-

**CARLSON LYNCH LLP**

*/s/ Edward W. Ciolko*
Gary F. Lynch
Edward W. Ciolko
James P. McGraw, III
1133 Penn Avenue
5th Floor
Pittsburgh, PA 15222
P (412) 322-9243
F. (412) 231-0246
E. glynch@carlsonlynch.com
    eciolko@carlsonlynch.com
    jmcgraw@carlsonlynch.com

**Admitted *Pro Hac Vice*

**ATTORNEYS FOR PLAINTIFFS**