# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BROOKE RYAN, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | Case No: 5:20-cv-02164-JMG |
| | ) | |
| v. | ) | CLASS ACTION |
| | ) | |
| TEMPLE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| CHRISTINA FUSCA, on behalf of herself and all others similarly situated | ) ) ) | |
| | ) | |
| Plaintiff, | ) | Case No: 2:20-cv-03434-JMG |
| | ) | |
| v. | ) | CLASS ACTION |
| | ) | |
| TEMPLE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS CONSOLIDATED SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 2

ARGUMENT ........................................................................................................................... 4

I.   PLAINTIFFS STATE A CLAIM FOR BREACH OF CONTRACT ..................................... 4

   A.  The SFRA Does Not Govern ......................................................................................... 5

      1.   The SFRA is Not a Contract .................................................................................... 5

      2.   The SFRA is Ambiguous and Incomplete ................................................................ 8

      3.   Plaintiffs' Claims Fall Outside the Scope of the SFRA ............................................ 11

      4.   Plaintiffs' Claims Also Fall Outside the Scope of Temple's "Tuition and
           Fees Policy" ............................................................................................................. 12

   B.  Plaintiffs Have Identified a Legally Specific Contract ..................................................... 14

   C.  Plaintiffs Have Alleged Cognizable Damages ................................................................ 19

II.  PLAINTIFFS DO NOT ALLEGE EDUCATIONAL MALPRACTICE .............................. 21

III. PLAINTIFFS STATE A CLAIM FOR UNJUST ENRICHMENT ....................................... 24

CONCLUSION ......................................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Ansari v. New York University*,
1997 WL 257473 (S.D.N.Y. 1997).........................................................................14

*Biddle v. Johnsonbaugh*,
444 Pa.Super. 450, 664 A.2d 159 (1995).................................................................6

*Bradshaw v. Pa. State Univ.*,
No. CIV.A. 10-4839, 2011 WL 1288681 (E.D. Pa. Apr. 5, 2011) ...............................26

*Carr v. St. John's Univ.*,
17 A.D.2d 632 (2d Dep't 1962) .............................................................................8

*Castrol Inc. v. Pennzoil Co.*,
987 F.2d 939 (3d Cir. 1993)..................................................................................17

*Cavaliere v. Duff's Bus. Inst.*,
413 Pa. Super. 357, 605 A.2d 397 (1992)..........................................................21, 22

*Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*,
795 F.2d 291 (3d Cir. 1986)...................................................................................8

*Chong v. Northeastern University*,
1:20-cv-10844-RGS, Order (D. Mass. Oct. 1, 2020).............................................9, 10

*Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*,
648 Pa. 604, 194 A.3d 1010 (2018).................................................................16, 17

*David v. Neumann Univ.*,
177 F. Supp. 3d 920 (E.D. Pa. 2016) ....................................................................26

*Eagle v. Morgan*,
No. 11-cv-4303, 2013 WL 943350 (E.D. Pa. Mar. 12, 2013) ....................................20

*Falconi-Sachs v. LPF Senate Square, LLC*,
142 A.3d 550 (D.C. 2016) ...................................................................................26

*Gally v. Columbia Univ.*,
22 F.Supp.2d 199 (S.D.N.Y. 1998)........................................................................16

*Gati v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*,
2014 Pa. Super. 99, 91 A.3d 723 (2014)...............................................................15

*Geisinger Clinic v. Di Cuccio,*
414 Pa. Super. 85, 606 A.2d 509 (1992) ............................................................... 5

*Goldman v. McShain,*
432 Pa. 61, 247 A.2d 455 (1968) ........................................................................... 8

*Green Valley Dry Cleaners, Inc. v. Westmoreland Cty. Indus. Dev. Corp.,*
832 A.2d 1143 (Pa. Commw. Ct. 2003) ................................................................. 9

*Greene v. Oliver Realty Co.,*
363 Pa.Super. 534, 526 A.2d 1192 (1987), appeal denied, 517 Pa. 607, 536 A.2d 1331 (1988) ... 5

*Ingrassia Const. Co., Inc. v. Walsh,*
486 A.2d 478 (Pa. Super. Ct. 1984) ................................................................. 17, 18

*Kazanjian v. New England Petroleum Corp.,*
332 Pa.Super. 1, 480 A.2d 1153 (1984) ................................................................ 8

*Lackner v. Glosser,*
2006 Pa. Super. 14, 892 A.2d 21 (2006) ............................................................... 6

*Lombardo v. Gasparini Excavating Co.,*
385 Pa. 388, 123 A.2d 663 (1956) ..................................................................... 6, 8

*Malone v. Academy of Court Reporting,*
582 N.E.2d 54(1990) ............................................................................................ 21

*McCabe v. Marywood Univ.,*
166 A.3d 1257 (Pa. Super. 2017) ........................................................................ 26

*Mikos v. Kida,*
314 Pa. 561, 172 A. 101 (1934) ............................................................................ 5

*Miller v. Thomas Jefferson University Hospital,*
908 F. Supp. 2d 639 (E.D. Pa. 2012) ................................................................... 25

*Ohama v. Markowitz,*
434 F. Supp. 3d 303 (E.D. Pa. 2020) .................................................................... 5

*Paladino v. Adelphi Univ.,*
89 A.D.2d 85, 454 N.Y.S.2d 868 (1982) ............................................................. 21

*Park v. Temple Univ.,*
No. CV 16-5025, 2019 WL 1865060 (E.D. Pa. Apr. 25, 2019) .................................. 26

iv

*Pashak v. Barish*,
303 Pa. Super. 559, 450 A.2d 67 (1982)......................................................................... 20

*Pollock Industries, Inc. v. General Steel Castings Corp.*,
203 Pa.Super. 453, 201 A.2d 606 (1964).................................................................... 17

*Ross v. Penn. State Univ.*,
445 F. Supp. 147 (M.D. Pa.1978)................................................................................. 15

*Schulman v. Franklin & Marshall Coll.*,
371 Pa. Super. 345 (1988)............................................................................................ 19

*Stevenson v. Economy Bank of Ambridge*,
197 A.2d 721 (Pa. 1964).............................................................................................. 20

*Swartley v. Hoffner*,
734 A.2d 915 (Pa. Super. 1999)................................................................................... 14

*Vantage Learning (USA), LLC v. Edgenuity, Inc.*,
246 F. Supp. 3d 1097 (E.D. Pa. 2017)................................................................. 24, 25

*Villareal v. Chamberlain Coll. of Nursing & Health Scis., Inc.*,
No. CV H-19-0300, 2019 WL 4736488 (S.D. Tex. Sept. 27, 2019) ........................... 16

*Villarreal v. Art Institute of Houston, Inc.*,
20 S.W.3d 792 (2000)......................................................................... 10, 11, 15

*Wolfe v. Allstate Prop. & Cas. Ins. Co.*,
790 F.3d 487 (3d Cir. 2015)........................................................................................ 20

*Zwiker v. Lake Superior State Univ.*,
No. 20-000070, Opinion and Order (Mich. Ct. Claims, Aug. 31, 2020)................. 9, 10

**Rules**

Fed. R. Civ. P. 8.................................................................................................... 20, 24

Fed. R. Civ. P. 12....................................................................................................... 22

Fed. R. Civ. P. 15....................................................................................................... 27

**Analogous Tuition Refund Orders Nationally**

*Cross v. Univ. of Toledo*,
No. 2020-00274JD, 2020 Ohio Misc. LEXIS 121 (Ct. Cl. July 8, 2020)...................... 23

*Garland v. Western Michigan Univ.*,
20-0063-MK (Mi. Ct. Cl. Sept. 15, 2020) ................................................................. 23

*McDermott v. Ohio State Univ.*,
No. 2020-00286JD, 2020 Ohio Misc. LEXIS 127 (Ct. Cl. Aug. 24, 2020) ................................ 23

*Mellowitz v. Ball State Univ. & Bd. of Trs. of Ball State Univ.*,
2020 Ind. Super. LEXIS 854 (Marion Sup. Ct. Civil Div. 14 Aug. 12, 2020) ........................... 23

*Milanov v. Univ. of Mich.*,
Case No. 20-000056-MK, 2020 Mich. Ct. Cl. LEXIS 1 (Ct. Cl. July 27, 2020) ......................... 23

*Rosado v. Barry Univ.*,
1:20-cv-21813-JEM, Order (S.D. Fla. Oct. 30, 2020) ................................................ 24

*Salerno v. Fla. S. Coll.*,
No. 8:20-CV-1494-30SPF, 2020 WL 5583522 (M.D. Fla. Sept. 16, 2020) ......................... 22, 25

*Smith v. The Ohio State Univ.*,
2020-00321JD (Oh. Ct. Cl. Sept. 9, 2020) ........................................................... 23

*Waitt v. Kent State Univ.*,
2020-00392JD (Oh. Ct. Cl. Sept. 28, 2020) ......................................................... 23

*Zahn v. Ohio Univ.*,
2020-00371JD (Oh. Ct. Cl. Oct. 19, 2020) ......................................................... 23

## INTRODUCTION

A Temple University ("Temple" or "Defendant") education costs just under $20,000 per year for Pennsylvania residents and just under $35,000 per year for out of state residents.  Even after grants and scholarships, the average net cost of attendance for Temple students is $23,000 per year,[1] meaning the average Temple student pays nearly $100,000 for a four-year degree.  Nearly 75% of students are required to take out loans to meet this tuition burden, and the average total indebtedness of the 2019 graduating class was $38,634.[2]

In operating, Defendant must attract students to its University, and convince them to pay $100,000 or more over the course of their education, substantially with borrowed money.  The student consumers must find Defendant's product compelling enough to borrow and spend this money.  To this end, Defendant markets a first-rate student experience, highlighting its "vibrant" campus, "state-of-the-art facilities", emphasis on "experiential learning," "vibrant residential setting," and other benefits of in-person enrollment.  In recent years, Temple has spent millions of dollars on campus development, including renovations to Bell Tower, Lenfest Circle, and Founder's Garden; and the construction of a new 27 story residence hall, a new student training and recreation complex, a new science education and resource center, O'Connor Plaza, and new four-story 225,000 square foot library.  Against this backdrop, Defendant now argues that it is no different than Phoenix University Online (where yearly tuition and fees are just over $10,000).

A major portion of Defendant's operating revenue comes from direct student payments in the form of tuition and fees.  Defendant collected over $838 million dollars from students in fiscal

---

[1]  https://nces.ed.gov/collegenavigator/?q=temple&s=all&id=216339#netprc (Accessed Nov. 1, 2020).

[2] https://www.usnews.com/best-colleges/temple-university-3371/paying (Accessed Nov. 1, 2020).

year 2020 alone.[3]  Defendant now argues that it promises students essentially nothing in return for these payments.  Specifically, Defendant argues that notwithstanding its marketing materials; notwithstanding its catalogs, circulars and bulletins; notwithstanding its registration platform; and notwithstanding its 136-year prior course of conduct, it never offered to provide in-person instruction, never promised to provide access to campus facilities or student activities, and has never obligated itself to do anything in exchange for the hundreds of millions of dollars it has collected from students except provide them with instructional hours.  Instead, Defendant contends that it should be free to keep all the money that students pre-paid for the spring 2020 semester, even though Defendant evicted students and closed campus for nearly half the semester.  More troubling, Defendant argues this is just and equitable.  It is not.

## FACTUAL BACKGROUND

Plaintiffs' allegations are straightforward.[4]  The Complaint alleges that students have multiple options when making the decision about enrolling in college.  ¶¶ 25-26.  To persuade prospective students to choose its school over others, Defendant engages in an aggressive marketing campaign, highlighting Temple's location, on-campus student experience, and focus on "experiential learning." *E.g.,* ¶¶ 74-85.  In recruiting students, Defendant promises, among many other things, an "urban setting" providing "transformative opportunities," ¶ 74; "experiential learning" *id.*; a campus "puls[ing] with vibrant energy thanks to numerous new building projects and the 11,000 students living on or around campus," ¶ 80; "a diverse range of activities on campus

---

[3] https://finance.temple.edu/sites/finance/files/2020%20-%20TU%20Consolidated%20Report%20-%20%28FINAL%29.pdf (Accessed Nov. 1, 2020).

[4] All references and citations to the "Complaint" and "¶" in this Memorandum refer to Plaintiffs' Consolidated Second Amended Complaint, filed September 4, 2020 [ECF 15], which is the operative Complaint in this action.

and in the surrounding cities," *id.*; "more than 300 student organizations," *id.*; "Division I sporting events," *id.*; "over 1,000 arts and music events on campus each year," *id.*; "the close-knit feel of a traditional campus setting," *id.*; that "you will never be bored at Temple.  On a daily basis you can choose from an eclectic array of cultural, athletic and social activities, such as student-run clubs, community-service projects, athletic events and musical performances," *id.*; "green space, athletic facilities and eclectic architecture ranging from the historic Temple Performing Arts Center to an emerging state-of-the-art Charles Library," ¶ 81; and "a vibrant residential setting," *id.*

> Notably, Defendant also acknowledges:
>
> > **Your college experience includes more than just academics.**  When not in class or hitting the books, be sure to take advantage of our impressive selection of health, fitness and recreation options, including world-class gyms and comprehensive student health center.
> >
> > **When you come to Temple, you also come to Philadelphia** – one of the nation's most diverse and vibrant cities.  Here, you'll find a hotbed of nightlife, culture, entertainment and cuisine, just minutes from campus.

¶ 85.  (Emphasis added).

Plaintiffs were enrolled at Temple for the Spring 2020 semester.  ¶22.  Plaintiffs attended Defendant's institution over many other colleges and universities, and accepted Defendant's offer of admission for the educational experiences promised above.  ¶ 27.  Plaintiffs paid all required tuition before the start of the Spring 2020 semester.  ¶ 23.  Besides tuition, Defendant charges certain mandatory fees including a "University Services Fee."  ¶ 32.  The University Services Fee is specifically charged in exchange for "state-of-the-art computer equipment…including modern lab facilities; access to all student activities, events, and recreational facilities; and basic student health and treatment services provided by nurses and physicians on campus."  ¶ 33.  Plaintiffs paid all mandatory fees for the Spring 2020 semester.  ¶ 36.

When Plaintiffs paid these tuition and fees, they entered into legally binding contracts with Defendant.  ¶¶ 70, 143.  The parties began performance under the contract.  Upon enrollment, Plaintiffs registered for classes through an online portal that specifically identified classes to be taught in physical classroom locations.  ¶ 102.  Each day for the first half of the semester, Plaintiffs attended in-person classes in physical classrooms on campus.  ¶ 106.  Each day for the first half of the semester, Plaintiff had full access to campus.  ¶ 108.

However, mid-way through the semester, Defendant breached the contract.  ¶¶ 114, 146.  Specifically, Defendant suspended all in-person classes, transitioning to an online-only format, and required students to vacate campus and return to their permanent homes. ¶¶ 43-44.  The campus shut-down continued for the remainder of the semester.

When Defendant closed campus and evicted students, Plaintiffs and other similarly-situated students did not receive the on-campus experience they were promised and for which they paid tuition, nor the benefits and services for which they paid additional fees.  ¶¶ 118, 148.  Yet Defendant has refused to reduce or refund the pre-paid tuition and fees accordingly, leaving students and parents like Plaintiffs with no other option but to seek legal relief.

## ARGUMENT

## I.    PLAINTIFFS STATE A CLAIM FOR BREACH OF CONTRACT

In seeking dismissal of Plaintiffs' breach-of-contract claim, Defendant raises three issues. First, Defendant argues that the entire relationship between itself and its students is governed by a single one-page document entitled the "Student Financial Responsibility Agreement" (hereafter "SFRA") and the limited tuition and fee refund policy found in Defendant's Undergraduate Bulletin.  Specifically, Defendant argues that this document forms an express written contract, and that such contract expresses the entire agreement between the parties, to the exclusion of any other agreement, implied or otherwise.  This argument fails because the SFRA is not a contract at all

4

and because, even if such agreement did form a contract (or part of a contract), such contract would be limited in scope, would not control the entirety of the relationship between Defendant and its students, and would not govern the facts and circumstances giving rise to this action.

Second, Defendant argues that, notwithstanding the SFRA, Plaintiffs have not identified the contract they seek to enforce.  Finally, Defendant argues that Plaintiffs see speculative damages.  Each of these arguments is without merit.

### A.  The SFRA Does Not Govern

#### 1.  The SFRA is Not a Contract

As an initial matter, the SFRA cannot be a contract at all because it lacks mutual consideration. "If a mutuality of promises is absent, the contract is unenforceable." *Geisinger Clinic v. Di Cuccio*, 414 Pa. Super. 85, 91, 606 A.2d 509, 512 (1992)(citing *Greene v. Oliver Realty Co.*, 363 Pa.Super. 534, 526 A.2d 1192 (1987), appeal denied, 517 Pa. 607, 536 A.2d 1331 (1988). "A mutuality of obligation exists when both parties to the contract are required to perform their respective promises." *Id.*  "The test for consideration is 'whether the promisee, at the instance of the promisor, has suffered any detriment, or whether, in return for the promise, he has done something that he was not bound to do, or has promised to do some act, or has abstained from doing something.'"  *Ohama v. Markowitz*, 434 F. Supp. 3d 303, 315 (E.D. Pa. 2020), *reconsideration denied*, No. CV 19-2150, 2020 WL 1124402 (Mar. 6, 2020)(quoting *Mikos v. Kida*, 314 Pa. 561, 172 A. 101, 102 (1934)).

Here, the SFRA imposes no obligation on Defendant.  The Agreement reads, in pertinent part, "[b]y registering for classes at Temple University, I agree to pay all assessed tuition and fees that result from my initial registration and/or future drop/add activity.  I understand that I am responsible to pay for all classes in which I am registered after the final day of the term's drop/add period."  While the document purports to bind the student to pay charges resulting from

registration, the document does not actually require Defendant to provide any benefits or services in exchange for such payment.

There is no indication within the SFRA that the University intends to be bound by any of its terms. The document is indeed a misnomer, as it is not an "agreement".  In reality, the SFRA is merely a one-sided "acknowledgment" on the part of the student (such as Plaintiffs and Class members) regarding a student's financial obligations, plus additional acknowledgments—*all by the student*—regarding the University's rights to take certain actions in furtherance of collection in the event of a student's delinquency.

No part of the SFRA obligates the University to provide or perform anything in any way or to refrain from doing anything, and the SFRA does not confer any enforceable rights on the student, or indicate that the University agrees to be bound by any part of it. The SFRA is not signed by the University or any of its representatives. Although the student is required to acknowledge that s/he has "read and agree[d] to these registration requirements," not a single phrase or sentence anywhere in the SFRA indicates a similar intention to be bound on the part of the University.

Assuming, *arguendo,* that the students' promise to pay charges associated with enrollment actually obligates Defendant to provide educational (or any) services following the enrollment, the document fails to address numerous material terms.  "An enforceable contract requires, among other things, that the terms of the bargain be set forth with sufficient clarity." *Lackner v. Glosser*, 2006 Pa. Super. 14, 892 A.2d 21, 30 (2006)(citing *Biddle v. Johnsonbaugh*, 444 Pa.Super. 450, 664 A.2d 159, 163 (1995)). "Where… there is no agreement or even a discussion as to any of the essential terms of an alleged bargain, such as time or manner of performance, or price or consideration, the 'agreement' is too indefinite…" *Id.* at 31(citing *Lombardo v. Gasparini Excavating Co.*, 385 Pa. 388, 123 A.2d 663 (1956)).

6

Here, the SFRA contains no material terms at all.  The document fails to address what (if any) services Defendant will provide or the duration that such services will be provided. Furthermore, the document fails to even establish the price that will be paid for the undefined services.  While the document does not even reference a published tuition and fee schedule, much less purport to limit the student's "agreement to pay" to any prices as scheduled.  Instead, Defendant appears free to assess any charge it sees fit, so long as the student completes registration and that charge "results" from registration and/or future drop/add activity -  another undefined clause that appears left to Defendant's unfettered discretion.  Indeed, under a literal reading of the document, once a student "registers for classes," the student then becomes liable to pay *any* amount charged by Defendant as a result, even if Defendant provides nothing in exchange.  This is not a hyperbolic statement.  In fact, this is the exact interpretation Defendant urges the Court to adopt. *See* Def.'s Mem. [ECF 16-1] at pg. 9-10 ("it was the act of registering for classes that required plaintiff to pay the fees at issue, not the receipt of certain services."). According to Defendant, the University could close its doors and expel all students (for any reason or no reason at all) the day after registration (or the expiration of the drop/add period) and such students would remain obligated to pay full tuition.  This is simply absurd.

More troubling, the document fails to set forth the rights or remedies of either party with respect to the services rendered.  For example, the document does not even contemplate the conferral of a degree – an important reason students would seek educational services in the first instance.  According to Defendant, its students could show up to class every day for four years, follow all the rules, pass all required classes, and just prior to graduation, be denied a degree for no reason at all.  This is not only contrary to common sense and well-established contract law, it is contrary to public policy.  "When a student is duly admitted by a private university . . . there is

an implied contract between the student and the university that, if he complies with the terms prescribed by the university, he will obtain the degree which he sought. The university cannot take the student's money, allow him to remain and waste his time in whole or in part . . . and then arbitrarily . . . refuse, when he has completed the required courses, to confer on him that which it promised, namely, the degree." *Carr v. St. John's Univ.*, 17 A.D.2d 632, 633 (2d Dep't 1962).

Likewise, while the document (through incorporation) provides students with certain refund options in the event the student *elects* to withdraw, and provides remedies for Defendant to pursue collection in the event of student nonperformance, the document provides no remedies whatsoever for the students in the event of the University's nonperformance (likely because the document does not require *bona fide* performance from the University in the first instance).

For these reasons, the SFRA is not a contract at all. Instead, it is a mere agreement to agree. The student agrees that, once he/she reaches a future agreement with Defendant regarding what classes the student will take, and what tuition Defendant will charge, if the University provides and the student takes the agreed upon classes, the student will pay the agreed upon tuition. "It is hornbook law that evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract." *Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291 (3d Cir. 1986)(citing *Goldman v. McShain*, 432 Pa. 61, 68, 247 A.2d 455, 458 (1968); *Lombardo,* 385 Pa. at 388; *Kazanjian v. New England Petroleum Corp.*, 332 Pa.Super. 1, 7, 480 A.2d 1153, 1157 (1984)).

### 2.  The SFRA is Ambiguous and Incomplete

Even if the SFRA evidences a *portion* of the overall contract between Defendant and its students, it cannot, as Defendant suggests, form the *complete* agreement, such as to prohibit the consideration of extrinsic evidence. As an initial matter, the SFRA contains no merger or integration clause. Therefore, it does not even *purport*, on its face, to be the entire agreement

8

between the parties. *See Green Valley Dry Cleaners, Inc. v. Westmoreland Cty. Indus. Dev. Corp.*, 832 A.2d 1143, 1155 (Pa. Commw. Ct. 2003) ("The absence of such a clause serves as persuasive evidence that the parties did not intend the Option Agreement to serve as a complete and exclusive statement of the terms of their transaction.").

Defendant suggests that this case is analogous to the recently issued opinion by the Michigan Court of Claims in *Zwiker v. Lake Superior State Univ.*, No. 20-000070, Opinion and Order (Mich. Ct. Claims, Aug. 31, 2020). However, Defendant's reliance on *Zwiker* is entirely misplaced. As an initial matter, the actual "Tuition Contract" that was the subject of that case has not been provided by Defendant. It is impossible to know whether and to what extent the *Zwiker* document mirrored the SFRA at issue in this case or, importantly, whether it contained a merger and integration clause. However, it is clear that the legal issue before the *Zwiker* court was not akin to the issue before this court. In *Zwiker*, the plaintiffs conceded that the Tuition Contract was the valid, binding, and controlling agreement between the parties. *See*, *Id.* at pg. 9 ("In arguing for a different outcome, plaintiff has not disputed the existence of the Tuition Contract, nor has she disputed that the document controls the parties' relationship."). Here, Plaintiffs concede neither point. As addressed above, Plaintiffs deny that the SFRA was a contract at all or is otherwise applicable, much less a complete, valid, and binding "tuition contract." Moreover, as addressed below, Plaintiffs deny that the SFRA controls the parties' relationship in the present case.

Defendant's reliance on *Chong v. Northeastern University*, 1:20-cv-10844-RGS, Order (D. Mass. Oct. 1, 2020) is equally misplaced. The *Chong* Court partially dismissed a tuition and fee refund action for reasons substantially similar to *Zwiker*. As in *Zwiker*, the *Chong* plaintiffs conceded the existence and applicability of a Financial Responsibility Agreement and plead that

9

the Financial Responsibility Agreement was the contract that gave rise to the entitlement for in-person instruction, a concession not made in the present case. *Chong* at pg. 6. Then, in opposing the Motion to Dismiss, the *Chong* Plaintiffs pivoted to an argument more akin to the arguments made here. However, the Court was not permitted to consider those arguments because they were not set forth in the Complaint. *Id.* at pg. 8 ("In their oppositional briefing, plaintiffs attempt to rectify their pleading deficiencies…The court cannot consider this evidence, however, because the [Second Amended Complaint] makes no mention [of it].") Importantly, the Court did not reject these arguments. Instead, the dismissal was issued **without prejudice**, indicating the Court's belief that such arguments had merit and that a future Complaint on those grounds would not be futile. As such, and as with *Zwiker, Chong* is not instructive to the present action because the Court was addressing an entirely different issue as framed by the plaintiffs' own pleadings.

Instead, the present case is much more analogous to *Villarreal v. Art Institute of Houston, Inc.*, 20 S.W.3d 792 (2000). In *Villarreal*, the Texas Court of Appeals was faced with the issue of whether or not to permit parol evidence in the face of a written and signed enrollment agreement. Unlike the SFRA in the present case, which contains almost no terms aside from an alleged promise to pay an undefined price in exchange for an undefined right to register for classes, the enrollment agreement in *Villarreal* contained "general terms regarding the amount of tuition, the policy for raising tuition, a notice that the student had the right to cancel the transaction prior to the expiration of five days from date of signing, a list of supplies, and other general policies of the school, such as a note that the school reserves the right to cancel enrollment of a student who does not appear to be making satisfactory progress." *Id.* at 796. Still, the Court found, "while the promises contained in the enrollment agreement may be clear, it is not clear that those are the only promises between the parties, and the plaintiff testified that they were not. Rather, we find that the

10

entire agreement was made partly through written documents, partly through oral representations, and partly through implicit promises ascertained by the parties' actions and surrounding circumstances." *Id.* at 797.

Such is the case here. Plaintiffs allege that Defendant offered to provide in-person instruction and an on-campus educational experience. The circumstances and terms of that offer are clearly set forth in the Complaint and in the sections below. There is nothing about the SFRA that contradicts or forecloses Plaintiffs from proceeding under those theories.

Finally, it is evident that Defendant, itself, is not confident in the argument it now advances. Defendant has since modified the SFRA for the 2020-2021 academic year to provide that "some or all instruction may be delivered remotely."[5] This inclusion does not cure the lack of consideration addressed above, but does demonstrate Temple's acknowledgment of what students had come to expect, what Temple was obligated to provide, and for what students contracted to receive. Temple could have included a similar disclaimer in the SFRA signed by Plaintiffs, but it did not.[6]

### 3. Plaintiffs' Claims Fall Outside the Scope of the SFRA

For similar reasons as to why the SFRA lacks consideration, so too does the SFRA lack applicability here. Defendant argues that the SFRA "does not state that classes will be conducted only on a live in-person basis." Def. mem. [ECF 16] at pg. 5. This is not surprising, because Temple guarantees *nothing* in the SFRA. Said another way, the SFRA is not applicable to

---

[5] Temple University Student Financial Responsibility Agreement, 2020-2021

https://bursar.temple.edu/sites/bursar/files/documents/FRA_Students_August_2020_Update.pdf

[6] Whether that disclaimer would have been enforceable is suspect, given the lack of mutual consideration addressed above, but is, in any event, irrelevant to the present action.

Plaintiffs' claims because there are no obligations therein on which a claim for breach can be made. It is not a contract.  The SFRA contains obligations only of the students, and only as it relates to making payments to the Defendant for tuition and fees.

The scope of the SFRA is limited to an applicant's promise to pay for services that are bargained for, and nothing further. Plaintiffs do not dispute that they are obligated to pay for services and opportunities when they sign up for and actually receive those services and opportunities.  Plaintiffs are, however, saying that they paid for certain in-person education and experiences, but received something materially different. Therefore, they do not contend they are not obligated to pay for *anything*, but do contend that what they paid for is not what they received. Plaintiffs merely seek appropriate prorated refunds, not full refunds.  The SFRA does not permit Defendant to sell a particular product, fail to deliver that product, and then keep the money anyway.

### 4.  Plaintiffs' Claims Also Fall Outside the Scope of Temple's "Tuition and Fees Policy"

Just as the SFRA does not form an express, fully integrated written contract governing this dispute, neither does Temple's published "Tuition and Fees Policy."  Instead, the policy sets forth the way that refunds will be handled when a student withdraws from a class or takes a leave of absence from the school.  Plaintiffs have not withdrawn or taken a leave of absence.  This policy contemplates a scenario where the student elects to break the contract.  It speaks nothing of what happens when the Defendant breaches the contract.

Defendant suggests that "The Tuition and Fees Policy provides only four limited exceptions to the general rule that no refunds are available after the drop/add deadline." Def. Mem. [ECF 15] at pg. 6.  Defendant misses the point.  Each of these exceptions contemplates a student's withdrawal from classes that Defendant is willing and able to provide.  Defendant was arguably not required to allow for *any* refunds in the face of a breach by its students (i.e. voluntary

withdrawal after the drop/add deadline).   That it provided for such refunds under certain circumstances was nice.  However, it does not relieve Defendant of its own obligation to perform. A party to a contract is contractually bound to perform under that contract.  That is the point of a contract.  The mere fact that Defendant's policy did not *also* promise to provide refunds in the face of Defendant's own breach is of no consequence.  Contracting parties rarely make such promises. This is the purpose of civil law and breach of contract actions such as the one brought by Plaintiffs. A party need not promise to make the other party whole in the event of a breach for a contract to be enforceable.  Such damages operate as a matter of law, not by agreement.  In sum, this policy governs refunds when students elect to withdraw from classes that are being offered as promised. It has no applicability where, as here, Defendant has failed to perform as promised.

Defendant's argument as to fees fares no better.  That the policy contains a phrase stating fees are "non-refundable" is of no consequence, substantially for the same reasons.   While Defendant might be free to refuse fee refunds in the face of a student's withdrawal (the likely intent of this handbook provision), Defendant cannot apply this policy in the face of its own breach.  A contract that provides no remedies is no contract at all, as it lacks consideration and/or is illusory. This is no more binding than a sign stating "all sales are final" on the McDonalds drive through board.  While such a policy might apply where the customer changes her mind after ordering (perhaps she spots a Burger King across the street), the policy would not allow McDonalds to collect full payment at the first window and then deliver only a portion of the order at the second window.

The distinction turns on whether the University is willing and able to provide the service and the student just elects not to accept it, or whether the University does not provide the service

at all.  If a party could contractually excuse itself from liability for non-performance, every contract of adhesion in America would do so.

**B.  Plaintiffs Have Identified a Legally Specific Contract**

In seeking dismissal, Defendant advances one additional legal exaggeration that must be debunked.  Defendant argues that a contract with a university can never be formed absent a written document expressing an absurd level of specificity.  For example, under Defendant's theory, an express written promise to provide state-of-the-art facilities (such as the one made by Defendant, ¶ 81) does not actually mean that students should expect access to those facilities.  Instead, Defendant argues the university would have to exclaim something to the effect of, "we did not build these facilities just for the sake of doing so.  We did not create videos about them and plaster pictures of them on our website and marketing brochures for no reason.  We did not invite you to campus to tour these facilities because we were bored.  Instead, we built these facilities for you to use and we wanted to show them to you so that you would be excited to come to our school and have access to them.  Enjoy!"  This simply is not the law anywhere in the country.  *See, e.g., Ansari v. New York University*, 1997 WL 257473 (S.D.N.Y. 1997)

Neither do such promises always have to be in writing.  To be sure, a contractual promise in the university setting must be sufficiently clear and specific.  The court and finder of fact must be able to decipher the intent of the parties.  The law does not allow for students to turn every minor grievance with their university into a breach-of-contract lawsuit alleging vague and indefinite broken promises.  But neither does the law require the level of specificity urged by Defendant, particularly in the category of contract action not involving student discipline or other highly specialized subjects of an academic nature such as those issues facing the Court in *Swartley v. Hoffner*, 734 A.2d 915 (Pa. Super. 1999).

14

Defendant's urged standard undercuts even the most basic contractual promise between student and university, that, "[a]t a minimum, an implied contract exist[s] between [students] and [the school] that [the school] [will] provide [students] an educational opportunity and confer upon [them] a degree…in consideration for [the student's] agreement to successfully complete degree requirements, abide by university guidelines, and pay tuition…" *Villarreal,* 20 S.W.3d at 797. Surely even Defendant would not dispute this baseline premise. However, this exact sentiment is not expressed anywhere in Defendant's written policies and procedures. There are written degree requirements and there are written university guidelines, but there is no express statement saying "if you complete the requirements and abide by the guidelines, we promise to award a degree." Instead, that promise is implied and universally recognized.

Applying Defendant's heightened standard, Defendant could presumably hold a degree hostage.[7] Imagine a scenario where, just prior to graduation, the University implements a new "conferral fee," requiring students to pay thousands of additional dollars before the university will grant the degree. This is simply not the law.

Nor is it the law, as Defendant argues, that the implied contract between a university and its students cannot be based, at least in part, on the parties' prior course of dealing. Def. mem. [ECF 15] at pg. 16. The Pennsylvania Superior Court has already held that promises from a school, so long as reasonably specific and definite, can be implied by course of dealing. "'A student has a reasonable expectation based on statements of policy by [the school] **and the experience of former students** that if he performs the required work in a satisfactory manner and pays his fees

---

[7] This is particularly true if read in conjunction with Defendant's argument that supposedly allows Defendant to charge any amount it deems appropriate under the SFRA that is "associated" with enrollment.

15

he will receive the degree he seeks.'" *Gati v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 2014 Pa. Super. 99, 91 A.3d 723, 731 (2014)(quoting *Ross v. Penn. State Univ.*, 445 F. Supp. 147, 152 (M.D. Pa.1978)) (**emphasis added**).

In the instant case, Plaintiffs have pointed to several specific, written promises. Defendant argues that the promises set forth in the Catalog cannot be considered because the Catalog states "neither this bulletin nor any parts of it may be relied upon as a contract between Temple and any student." Def. mem. [ECF 15] at pg. 13. However, such a generalized disclaimer offers Defendant little protection. As Courts across the country have held, "[t]he Court rejects defendant's argument that no contract existed between plaintiff and [the school] because the [school] bulletin contained a contract disclaimer. While [the school] could disclaim the existence of a specific promise through the use of such a disclaimer, it could not unilaterally disclaim all contractual relations." *Gally v. Columbia Univ.*, 22 F.Supp.2d 199 at n. 7 (S.D.N.Y. 1998). *See also Villareal v. Chamberlain Coll. of Nursing & Health Scis., Inc.*, No. CV H-19-0300, 2019 WL 4736488 at *3 (S.D. Tex. Sept. 27, 2019) (holding that catalog might not form a binding contract where catalog reserves the right to change terms and conditions, but finding "the terms of the Academic Catalog form the foundation of the parties' contractual relationship regardless of whether it is the actual contract...or whether it sets forth the terms of an implied contract.").

Defendant likewise dismisses the numerous promises on its website as "vague or aspirational statements" that do not indicate "that the parties intended to enter into a bargain." Def. Memo. [ECF 15] at pg. 15. Essentially, Defendant categorizes these specific written promises as "puffery." A statement may be deemed puffery where "the impression created by the statement is one of exaggeration or overstatement expressed in broad language." *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 648 Pa. 604, 625 194 A.3d 1010, 1023 (2018)(citing *Castrol*

*Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993)).[8]  "A salient characteristic of statements deemed to be 'puffery' is that consumers understand that the statements are not to be taken literally." *Id.*

Here, it strains logic to suggest that students receiving published course catalogs and registration materials directing them to be physically present at specific locations during specific times to earn credits in specific classes would not take those instructions literally.  Likewise, to assume that students promised state-of-the art facilities and touring those facilities at Defendant's direction would not literally believe that they were paying for access to those facilities.  In any event, "[s]tate and federal courts are united in the principle that the determination as to whether a statement is deemed puffery is a question of fact to be resolved by the finder of fact except in the unusual case where the answer is so clear that it may be decided as a matter of law." *Id.*  As such, this defense is not appropriate for consideration at the motion to dismiss stage.

In any event, "A contract implied in fact has the same legal effect as any other contract.  It differs from an express contract only in the manner of its formation." *Ingrassia Const. Co., Inc. v. Walsh,* 486 A.2d 478, 483 n.7 (Pa. Super. Ct. 1984).  "A contract implied in fact can be found by looking to the surrounding facts of the parties' dealings." *Id.* at 483.  "Implied contracts ... arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract." *Pollock Industries, Inc. v. General Steel Castings Corp.*, 203 Pa.Super. 453, 201 A.2d 606, 610 (1964).

---

[8] It should be noted that *Shapiro* is discussing "puffery" in the context of a Lanham Act false advertising claim, not a breach of contract claim.  Nonetheless, the basic definition of "puffery" does not differ based upon the cause of action in which it is raised as a defense.

Defendant heavily markets its on-campus activities and opportunities as a benefit of enrollment.  Plaintiffs registered for classes that were listed on the registration portal by physical location.  Plaintiffs showed up for in-person classes, and otherwise had access to campus facilities and services, every day for the weeks and months leading up to the time that they were evicted from campus.  No reasonable person paying tuition prior to COVID-19 could have believed anything other than that they were signing up for on-campus, in-person education.  In fact, it would be disingenuous for Defendant to suggest that, prior to COVID-19, their official response to a student asking if classes were taught in-person would have been "no."  Even if Defendant were to make this absurd claim, "it matters not whether [the Defendant] truly believed a contract did not exist if his manifested intent reasonably suggested the contrary to [the plaintiff]." *Walsh*, 486 A.2d at 483.  Accordingly, Defendant's Motion should be denied.  *See*, *id.* at 486 A.2d 478 at 482 ("Where the facts are in dispute, the question of whether a contract was formed is for the jury to decide.").

In sum, breach-of-contract actions can sometimes trade in the minutia.  Parties may disagree as to the meaning of specific terms or the highly technical application of lengthy contracts written by overpriced lawyers containing more Latin phrases than English ones.  This is no such case.  Plaintiffs do not seek to enforce some obscure provision buried deep within a university catalog.  This action does not seek to overturn a disciplinary decision or poor performance assessment by latching onto a vague procedural statement in the student handbook. Rather, this action contemplates one of the most fundamental and universally understood and accepted relationships ever existing between student and university, and one about which there has been no confusion since the first universities were established in this country dating back to the 1600's.  That is that when young adults "go off to college," there is indeed a campus to which they go to

complete their studies.  The Merriam-Webster dictionary defines "university" as "an institution of higher learning providing facilities for teaching and research and authorized to grant academic degrees."

As the Superior Court recognized in 1988, "[a] college is frequently selected by parents and students because of the special aura or quality of life on campus that distinguishes it from other institutions." *Schulman v. Franklin & Marshall Coll.*, 371 Pa. Super. 345, 351 (1988).

### C.  Plaintiffs Have Alleged Cognizable Damages

Defendant argues that the damages alleged in the Complaint are speculative. Def. Mem. [ECF 15] at pg. 22-24. The crux of this argument, however, is based on the flawed notion that Plaintiffs' claims are for educational malpractice. This is evinced by Defendant's repeated use of the word "quality" and the citations to several cases involving claims for educational malpractice. As stated *ad nauseam* herein, Plaintiffs' claims are not for educational malpractice or based on the quality of education received, although the quality was indeed sub-par. Rather, Plaintiffs and members of the putative Class pre-paid for in-person education and services, and Defendant unilaterally changed the product offered half-way through the Spring 2020 semester. Simply put, regardless of quality, Plaintiffs bargained for and paid for one product, and Defendant provided another.

Plaintiffs' suffered, and sufficiently alleged, identifiable damages as a result of Defendant's providing a different product than originally contracted for. ¶¶ 3, 120, 121, 148, 149. Defendant's main argument seems to be that the fact-finder would have a difficult time determining the amount of damages, because it would require a comparison of in-person classes versus online classes. According to Defendant's logic, no one would ever be able to bring a breach of contract claim because the fact-finder would have to make a value determination between two products or services.  Difficulty in determining the amount, however, does not render a damages claim

19

defectively speculative.  Defendant's own cited cases emphasize this point.  "The test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages.... Thus, damages are speculative only if the uncertainty concerns the *fact* of damages rather than the *amount*." (original emphasis) *Pashak v. Barish*, 303 Pa. Super. 559, 450 A.2d 67 (1982). "[P]laintiff's claimed damages were based on 'mere guess or speculation' and were 'legally insufficient'; 'Plaintiff has not established *the fact* of damages with reasonable certainty.')" (emphasis in original) *Eagle v. Morgan*, No. 11-cv-4303, 2013 WL 943350, at *13 (E.D. Pa. Mar. 12, 2013) (quoting  *Stevenson v. Economy Bank of Ambridge*, 197 A.2d 721, 727 (Pa. 1964)). Therefore, the question as to amount is unwarranted and misplaced.

Plaintiffs' sufficiently plead that they have suffered damages by way of Defendant's conduct. ¶¶ 3, 120, 121, 148, 149. Nowhere in Fed. R. Civ. P. 8(a) is there a requirement for Plaintiffs' to allege a specific dollar amount. Plaintiffs' intend to use discovery and expert testimony to establish damages at trial. As to the breach of contract claim, even if damages are unable to be determined, "[u]nder Pennsylvania law, if a plaintiff is able to prove a breach of contract but can show no damages flowing from the breach, the plaintiff is nonetheless entitled to recover nominal damages." *Wolfe v. Allstate Prop. & Cas. Ins. Co.,* 790 F.3d 487, 497 (3d Cir. 2015).  The absence of provable damages is improper even at the summary judgment stage, let alone by motion to dismiss. *Id.* at 497-498. However, Plaintiffs are confident that provable damages can be ascertained from discovery and expert testimony, the same way Defendant can calculate the appropriate amount to charge for tuition in-person as compared to its online courses. Otherwise, such figures would be completely arbitrary. Therefore, the damages are not speculative and are sufficiently alleged.

20

## II.      PLAINTIFFS DO NOT ALLEGE EDUCATIONAL MALPRACTICE

Defendant also seeks dismissal on the basis that the Complaint, according to Defendant, alleges educational malpractice.  The gravamen of an educational malpractice claim is the allegation that a school failed to provide an effective education.  *Cavaliere v. Duff's Bus. Inst.*, 413 Pa. Super. 357, 605 A.2d 397 (1992).  Thus, an educational malpractice claim is one that "amounts to a general allegation of lack of quality education, without more" *Id.* at A.2d 404.

Not every action by a student against a school is an educational malpractice claim.  Where the breach of contract claim does not allege that "that the school breached its agreement by failing to provide an effective education," but instead alleges failure to provide other specified services, the action may be properly maintained.  *Paladino v. Adelphi Univ.*, 89 A.D.2d 85, 454 N.Y.S.2d 868 (1982)(cited with approval by *Cavaliere*, 605 A.2d at 401). The *Paladino* Court held that, "If…a private school were to accept a student's tuition and thereafter provide no educational services, an action for breach of contract might lie. Similarly, if the contract with the school were to provide for certain specified services, such as for example, a designated number of hours of instruction, and the school failed to meet its obligation, then a contract action with appropriate consequential damages might be viable." *Id.* at 92.

In adopting the distinction set forth by *Paladino*, as well as the Ohio case of *Malone v. Academy of Court Reporting*, 582 N.E.2d 54(1990), the Superior Court of Pennsylvania stated as follows:

> This is not to say, however, that it should be the policy of this Commonwealth to bar an action against a private trade school in every instance, no matter what the allegations of the complaint. We are convinced that the distinction drawn by the *Paladino* and *Malone* courts is valid. We can fathom no policy against permitting a cause of action for breach of contract or misrepresentation where, for example, a private trade school has made a positive representation that a certain curriculum will be offered and the student then finds that such curriculum is not available or where the school has asserted that it is accredited or licensed to give a certain degree and it is later discovered that this is false. In such a case, the nature of the

21

contractual undertaking and the breach thereof are clear and the plaintiff may be able to establish a cause of action against the offending institution.

*Cavaliere*, 605 A.2d at 404.

The Complaint does not allege a cause of action for educational malpractice.  ¶ 115.  While the quality of the education Plaintiffs received was certainly subpar, Plaintiffs' claims are not premised upon Defendant's general failure to provide a quality education.  Instead, the Complaint points to specific and identifiable promises and representations made by Defendant.   The Complaint alleges that Defendant promised an on-campus, in-person educational experience, and the opportunities accompanied therewith.

While Defendant may dispute these allegations, it is abundantly clear that the Complaint alleges a claim that does not seek redress for generalized educational malpractice.   These allegations must be taken as true for purposes of the instant motion to dismiss, and accordingly, dismissal is not warranted.   Indeed, there are approximately 150 lawsuits currently pending throughout the country related to the failure of colleges and universities to provide appropriate refunds after switching to remote instruction during the spring of 2020.

No court has yet to agree that these lawsuits invoke the educational malpractice doctrine. Instead, of the ten cases where 12(b)(6) arguments have been fully adjudicated, all ten motions have been denied as to this argument.  *See Salerno v. Fla. S. Coll.,* No. 8:20-CV-1494-30SPF, 2020 WL 5583522 at *4 (M.D. Fla. Sept. 16, 2020)(finding complaint sufficiently alleged "that the College's publications clearly implied that courses would be conducted in-person" and "underscore[ing] that this case is not about the quality of the College's education… This case is simply about an alleged promise to provide in-person learning that was allegedly breached.") (Ex. A); *Milanov v. Univ. of Mich.*, Case No. 20-000056-MK, 2020 Mich. Ct. Cl. LEXIS 1, *8-9 (Ct. Cl. July 27, 2020)("[Plaintiffs] are arguing that the university promised one method of instruction,

22

charged tuition and fees commensurate with that method of instruction, yet provided a different (allegedly lesser) method of instruction. This is a claim potentially sounding in contract or in quasi-contract, not in due process" and "while [case law] describes a number of areas into which a Court should be hesitant to intrude, principles of contract and quasi-contract are not among those areas.") (Ex. B); *McDermott v. Ohio State Univ.*, No. 2020-00286JD, 2020 Ohio Misc. LEXIS 127, *5 (Ct. Cl. Aug. 24, 2020)("Plaintiff's complaint does not merely assert that the education she received was substandard due to the clinic being closed. Rather, plaintiff alleges that defendant charged a fee specifically to support the dental clinic and then closed the clinic. That is sufficient to assert an unjust enrichment claim.") (Ex. C); *Cross v. Univ. of Toledo*, No. 2020-00274JD, 2020 Ohio Misc. LEXIS 121,  *7-8 (Ct. Cl. July 8, 2020) (Ex. D); *Mellowitz v. Ball State Univ. & Bd. of Trs. of Ball State Univ.*, 2020 Ind. Super. LEXIS 854, *1 (Marion Sup. Ct. Civil Div. 14 Aug. 12, 2020) (Ex. E); *Waitt v. Kent State Univ.,* 2020-00392JD (Oh. Ct. Cl. Sept. 28, 2020) at *3 ("Waitt's first amended class action complaint does not present a claim of 'educational malpractice' as KSU suggests.") (Ex. F); *Garland v. Western Michigan Univ.*, 20-0063-MK (Mi. Ct. Cl. Sept. 15, 2020) at *7 ("the Court disagrees that plaintiff's complaint asks the Court to interfere with WMU's academic autonomy...") (Ex. G); *Smith v. The Ohio State Univ.,* 2020-00321JD (Oh. Ct. Cl. Sept. 9, 2020) at *3 ("Plaintiff alleges that when she paid tuition to defendant a contract was created and that by holding classes virtually and not refunding a portion of the previously paid tuition and fees, defendant breached said contract...The mere mention of possible consequences to plaintiff's educational or professional future does not render plaintiff's complaint a claim for educational malpractice.") (Ex. H); *Zahn v. Ohio Univ.,* 2020-00371JD (Oh. Ct. Cl. Oct. 19, 2020) at *8 ("To dismiss a claim because it is novel would be a mistake.  Plaintiff will be given the opportunity to proceed with her claims individually and/or by class action...Defendant's motion to dismiss

23

Plaintiff's breach of contract and unjust enrichment claims is DENIED") (Ex. I); *Rosado v. Barry Univ.*, 1:20-cv-21813-JEM, Order (S.D. Fla. Oct. 30, 2020)(Exhibit J).

## III.   PLAINTIFFS STATE A CLAIM FOR UNJUST ENRICHMENT

Defendant finally argues that Plaintiffs' unjust enrichment claims fail because "(a) [Plaintiffs'] relationship with Temple is governed by a contract; and (b) the Complaint does not contain allegations showing that Temple has been enriched unjustly." Def. Mem. [ECF 15] at pg. 25.

Defendant's argument ignores the plain reading of Fed. R. Civ. P. 8(d)(3), which provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." *See, e.g.*, Fed. R. Civ. P. 8(a)(3) ("[A] demand for relief sought, which may include relief in the alternative or different types of relief.").  Defendant relies on *Vantage Learning (USA), LLC v. Edgenuity, Inc.,* 246 F. Supp. 3d 1097 (E.D. Pa. 2017), in stating that "the existence of a contract prevents a party from bringing a claim for unjust enrichment." *Id.* at 1100. Defendant, however, conveniently ignores the rest of the *Vantage Learning* opinion, which states, "Rule 8(d)(2) nonetheless permits a plaintiff to plead unjust enrichment in the alternative in certain circumstances, even where the existence of a contract would preclude recovery for unjust enrichment." (internal quotations omitted)). *Id.* "Such circumstances require either that (i) the contract at issue covers only a part of the relationship between the parties, or that (ii) the existence of a contract is uncertain or its validity is disputed by the parties." (citations omitted) *Id.* As stated herein repeatedly, Plaintiffs' dispute that the SFRA and Tuition and Fees Policy are a valid contract, dispute these documents govern any of the terms of the agreement, or, in the alternative, allege that it does not govern all of the terms of the agreement between the parties. Defendant's reliance on *Miller v. Thomas Jefferson University Hospital*, 908 F. Supp. 2d 639 (E.D. Pa. 2012) is also misplaced, as it was not decided on a motion to dismiss based on the pleadings.

Cases in which the existence of the governing contract is in dispute are exactly the type where it is permissible to plead unjust enrichment in the alternative. *Vantage Learning*; *Salerno*, 2020 WL 5583522 at \*5 (allowing unjust enrichment to be plead in the alternative where "[r]egardless of whether a contract exists, the College disputes the merits of the breach of contract claim").

Likewise, Defendant argues that "Temple was legally barred from continuing with in-person classes because of shutdown orders issued by Philadelphia Mayor Jim Kenney and Pennsylvania Governor Tim Wolf." Def. mem. [ECF 15] at pg. 1. Illegality, like impossibility, is an avoidance defense which, if proven, renders an otherwise valid contract unenforceable. If the finder of fact (or the Court at a later stage) finds that Defendant's performance was excused under the doctrine of illegality, Plaintiffs' claims for equitable relief are not only viable, but appropriate. Indeed, in the cases of impossibility, impracticability, and frustration of purpose, **both** parties are excused from performance, and the law seeks to restore both parties to their pre-contract position. In a case such as this, where Plaintiffs have already performed (by pre-paying tuition and fees), equitable disgorgement is required to accomplish this result. *See, e.g.,*

> Judicial statements to the effect that 'there can be no unjust enrichment in contract cases' can be misleading if taken casually. Restitution claims of great practical significance arise in a contractual context, but they occur at the margins, when a valuable performance has been rendered under a contract that is invalid, or subject to avoidance, or otherwise ineffective to regulate the parties' obligations. Applied to any such circumstance, the statement that there can be no unjust enrichment in contract cases is plainly erroneous.

*Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016). As such, even if the parties agreed on the existence and terms of the contract, there is a clear dispute over its enforceability.

25

Defendant then argues Plaintiffs' unjust enrichment claim fails because Defendant's conduct was not "unjust." Def. Mem. [ECF 15] at pg. 26. Initially, this is a premature factual argument, as the Complaint, to which the Court is presently bound, says that it was. ¶¶ 130, 157. This allegation must be taken as true for purposes of the present Motion. In any event, Defendant's argument is not founded in common sense. According to Defendant, Temple University can accept tuition and fees from students, terminate their enrollment, and retain all funds in a just and fair manner.

As support, Defendant cites *Bradshaw v. Pa. State Univ.*, No. CIV.A. 10-4839, 2011 WL 1288681, at *2 (E.D. Pa. Apr. 5, 2011); *David v. Neumann Univ.*, 177 F. Supp. 3d 920, 925 (E.D. Pa. 2016); *Park v. Temple Univ.*, No. CV 16-5025, 2019 WL 1865060, at *18 (E.D. Pa. Apr. 25, 2019); and *McCabe v. Marywood Univ.,* 166 A.3d 1257, 1264 (Pa. Super. 2017). None of these cases have any bearing on the instant case. *Park* involved Temple University expelling a dentist hired at the university's clinic after he lied on his application. The unjust enrichment claim was not based on tuition paid, but rather, the value added to the university through his participation in the clinic. *Id.* at *18. The plaintiff in *David* finished the classes as paid for, received a failing grade, and was terminated from the university's program for such failure. She brought a claim for unjust enrichment, despite having attended all of the classes paid for. The plaintiff in *Bradshaw* was similarly dismissed from the university, and failed to allege that she was prevented from attending the classes for which she paid. *Id.* at *2. The plaintiff in *McCabe* transferred schools when Marywood University was on the verge of losing their nursing accreditation. Some of the plaintiff's academic credits did not transfer to her new institution of enrollment. She subsequently brought a claim for unjust enrichment for tuition payments against the school for those lost credits;

26

however, the court found that the loss of credits was due to her voluntary transfer, and not any action of the school.

Far removed from those cases, the Plaintiffs and putative Class members in the instant case were not dismissed, were not provided all of the classes as paid for, are not making a claim for any loss sustained by their own voluntary actions, and *did* allege that they were prevented from taking the classes in-person, as paid for. Therefore, the retention of the tuition and fees pre-paid for in-person and on-campus education and experiences is unjust.

As a result of the closure of campus, Defendant saved significant sums of money in the way of reduced utility costs, reduced maintenance and staffing requirements, reduced or eliminated hours for hourly employees, *etc*.  ¶¶ 131, 158.  At the same time, Defendant received a significant bailout from the Federal Government under the CARES Act, most of which Defendant retained for itself as opposed to passing those funds along to students. ¶¶ 135, 162.  All the while, Defendant is supported by a multi-million-dollar endowment while its students incur debt to pay the very fees and tuition Defendant seeks to retain.  ¶¶ 134, 161.  This is a textbook example of an unjust and inequitable arrangement and Plaintiffs' claims for unjust enrichment should not be dismissed.

## CONCLUSION

For the reasons provided above and for good cause shown, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss in its entirety.  Should the Court grant any aspect of Defendant's motion, Plaintiffs request that any such decision be without prejudice and with leave to amend under the liberal provisions of Fed. R. Civ. P. 15(a).


[Signatures on Following Page]

Dated November 4, 2020

**CARLSON LYNCH LLP**

_/s/ Gary F. Lynch_
Gary F. Lynch
Edward W. Ciolko**
Nicholas A. Colella**
1133 Penn Avenue 5th Floor
Pittsburgh, PA 15222
P. (412) 322-9243
F. (412) 231-0246
E. glynch@carlsonlynch.com
    eciolko@carlsonlynch.com
    ncolella@carlsonlynch.com

-and-

**ANASTOPOULO LAW FIRM, LLC**

_/s/ Eric M. Poulin_
Eric M. Poulin**
Roy T. Willey, IV **
32 Ann Street
Charleston, SC 29403
P. (843) 614-8888
F. (843) 494-5536
E. eric@akimlawfirm.com
    roy@akimlawfirm.com

-and-

**CARPEY LAW, P.C.**
Stuart A. Carpey, #49490
600 W. Germantown Pike, Suite 400
Plymouth Meeting, PA 19462
(610) 834-6030
scarpey@carpeylaw.com

**Admitted Pro Hac Vice

**ATTORNEYS FOR PLAINTIFFS**

28