**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2013
_____

CLAIRE HICKEY; AKIRA KIRKPATRICK;
VALERI NATOLI; CANDACE N. GRAHAM; CARLY
SWARTZ; NICHOLAS BOWES,
on behalf of themselves and all others similarly
situated,
*Appellants*

v.

UNIVERSITY OF PITTSBURGH
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-20-cv-00690)
District Judge:  Honorable William S. Stickman, IV

_____

No. 21-2016
_____

BROOKE RYAN, individually and on behalf of all
others similarly situated; CHRISTINA FUSCA, on behalf of
herself and all others similarly situated,

Appellants

v.

TEMPLE UNIVERSITY
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-20-cv-02164)
District Judge:  Honorable John M. Gallagher
_____

Argued January 25, 2023

Before:   HARDIMAN, KRAUSE, and MATEY,
*Circuit Judges.*

(Filed: September 6, 2023)


Gary F. Lynch [**ARGUED**]
Lynch Carpenter
1133 Penn Avenue
5th Floor
Pittsburgh, PA 15222

Jeffrey A. Klafter
Seth R. Lesser
Klafter Lesser
Two International Drive
Suite 350
Rye Brook, NY 10573

Eric Poulin
Poulin, Willey & Anastopoulo
32 Ann Street
Charleston, SC 29403

Roy T. Willey, IV
Anastopoulo Law Firm
32 Ann Street
Charleston, SC 29403
       *Counsel for Appellants Claire Hickey, et al*

Stuart A. Carpey
Suite 400
600 W Germantown Pike
Plymouth Meeting, PA 19462

Edward W. Ciolko
Nicholas Colella
Jamisen A. Etzel
Gary F. Lynch [**ARGUED**]
Lynch Carpenter
1133 Penn Avenue
5th Floor
Pittsburgh, PA 15222

Eric Poulin
Poulin, Willey & Anastopoulo
32 Ann Street
Charleston, SC 29403

Roy T. Willey, IV
Anastopoulo Law Firm
32 Ann Street

Charleston, SC 29403
        *Counsel for Appellants Brooke Ryan, et al*

James C. Martin [**ARGUED**]
Colin E. Wrabley
Reed Smith
225 Fifth Avenue
Suite 1200
Pittsburgh, PA 15222
        *Counsel for Appellees University of Pittsburgh*

Gerard A. Dever
Roberta D. Liebenberg
Fine Kaplan & Black
One S Broad Street
Suite 2300
Philadelphia, PA 19107

Burt M. Rublin
Ballard Spahr
1735 Market Street
51st Floor
Philadelphia, PA 19103
        *Counsel for Appellees Temple University*

Jessica L. Ellsworth
Nathaniel A.G. Zelinsky
Hogan Lovells US
555 Thirteenth Street NW
Columbia Square
Washington, D.C. 20004
        *Counsel for Amicus Appellees American Council on*
*Education, et al*

Michael E. Baughman
Christopher R. Healy
Troutman Pepper
Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103
    *Counsel for Amicus Appellees Association of Independent Colleges and   Universities of Pennsylvania, et al*

————————————

OPINION OF THE COURT

————————————

KRAUSE, *Circuit Judge*.

Like many colleges and universities across the country, the University of Pittsburgh and Temple University responded to the novel coronavirus pandemic by transitioning to remote learning in March 2020.  Their former students—now Appellants in this consolidated class-action appeal—do not challenge the wisdom of those decisions.  But they do seek partial refunds of tuition and fees on the grounds that they received a materially different educational experience than they were promised and that they were denied access to on-campus facilities and services for which they paid specific fees.

Both District Courts in the underlying cases granted the Universities' motions to dismiss for failure to state a claim.  For the following reasons, we will affirm in part, reverse in part, and remand for further proceedings.

## I.    __Background__

The University of Pittsburgh ("Pitt") and Temple University ("Temple") are institutions of higher learning located in Pittsburgh and Philadelphia, respectively. Both universities offer traditional, on-campus educational programs. Temple also offers fully online distance-learning programs, which are separately advertised and priced. Appellants are former Pitt and Temple students (collectively, "the Students") who enrolled in the Universities' traditional on-campus programs for the Spring 2020 semester.[1]

To enroll, the Students were required (1) to pay tuition and mandatory fees, and (2) to sign a Financial Responsibility Agreement ("FRA") via an online registration portal. The Pitt fees included a student activity fee; a wellness fee; a computing and network services fee; and a security, safety, and transportation fee. Temple charged one "University Services" fee that funded numerous on-campus services and applied only to in-person students. Students at both universities also pre-paid housing and dining fees if they anticipated use of those services.

The FRAs—on which the District Courts relied to dismiss the Students' claims—are one to two-page documents

---

[1] Appellants Claire Hickey, Akira Kirkpatrick, Valeri Natoli, Candace N. Graham, Carly Swartz, and Nicholas Bowes—former students of the University of Pittsburgh (the "Pitt Students")—brought suit in the Western District of Pennsylvania in May 2020. Appellants Brooke Ryan and Christina Fusca—former students of Temple University (the "Temple Students")—initially filed separate suits in the Eastern District of Pennsylvania, but those were consolidated in the District Court in August 2020.

obligating students to timely pay tuition and fees and providing the Universities with certain collection rights if those payments are not made.

As relevant here, Temple's FRA provides:

- "[B]y registering for classes at Temple University, I agree to pay all assessed tuition and fees that result from my initial registration and/or future drop/add activity. I understand that I am responsible to pay for all classes in which I am registered after the final day of the term's drop/add period[.]" Temple App. 139.

Pitt's FRA provides:

- "I understand that when I register for any class at the University of Pittsburgh, or receive any service from the University of Pittsburgh, I accept full responsibility to pay all tuition, fees and other associated costs assessed as a result of my registration and/or receipt of services," Pitt App. 53;
- "[M]y registration and acceptance of these terms constitutes a Promissory Note agreement . . . in which the University of Pittsburgh is providing me educational services," *id.*; and
- "[I]f I drop or withdraw from some or all of the classes for which I register, I will be responsible for paying all or a portion of tuition and fees in accordance with the published tuition refund schedule . . . ," *id.*

In addition, Pitt's FRA—but not Temple's—contains an integration clause stating that the FRA "constitutes the entire agreement between the parties with respect to the matters described." *Id.* at 54.

Pitt and Temple's Spring 2020 semesters began on January 6, 2020, and January 13, 2020, respectively. As usual, students who enrolled in the traditional on-campus programs received in-person instruction and access to campus facilities. Midway through the semester, however, on March 11, 2020, then-Governor Wolf ordered a temporary closure of all non-life sustaining businesses in light of the rising number of COVID-19 cases in Pennsylvania. That same day, the World Health Organization declared COVID-19 a global pandemic.[2]

In response, the Universities closed campus buildings, canceled all on-campus student events, announced that classes would be conducted online for the remainder of the semester, and urged students not to return to campus housing.[3] Neither university offered any reduction in tuition or mandatory fees. Temple issued pro-rata housing and dining refunds for all students, while Pitt did so only for students who moved out by April 3, 2020.

---

[2] World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[3] Pitt also canceled classes outright during the week of March 16, 2020.

Seeking additional recompense, the Students, on behalf of themselves and others similarly situated, brought suit against their respective institutions for breach of contract, or, in the alternative, unjust enrichment.[4]  The Students alleged that they "paid tuition for a first-rate education and educational experience" but "were provided with a materially different product" and likewise "paid fees for services and facilities which are simply not being provided."  Pitt App. 29-30; *see* Temple App. 102-05 (similar).  Their theory was not that written contracts, like the FRAs, provided for in-person classes or services, but rather that "[t]he terms of this contract [we]re as implied or set forth" through the Universities' "website[s], academic catalogs, student handbooks, marketing materials and other circulars, bulletins, and publications," which described the benefits of campus life.  Temple App. 110; *see* Pitt App. 41 (similar).  As additional evidence of this implied promise, they pointed to the Universities' pre-pandemic practices of holding in-person classes and the reduced pricing for online courses.

By way of remedy, the Students sought pro-rated tuition and fees reflecting the difference in value between what they purportedly bargained and paid for—in-person classes and services—and what they received—a fully remote experience for the latter half of the Spring 2020 semester.  Likewise, they sought disgorgement of any profits that the Universities retained by moving online.  The Pitt Students (only) also sought reimbursement for unused housing and dining fees for

---

[4] Both sets of students also brought conversion claims but have since abandoned them on appeal.

9

those who did not move out by April 3 and thus did not receive pro-rated refunds.

Both actions, however, were dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. As for the contract claims, the District Courts found the FRAs to be fully integrated agreements that governed the parties' relationships with respect to the collection of tuition and fees and that did not require in-person instruction or services. The Courts also found that, even if the FRAs did not govern, the Students failed to state a breach of implied contract claim because they did not identify any specific and identifiable promise that the Universities had broken. As for the unjust enrichment claims, the Courts determined that they were foreclosed by the FRAs and that, in any event, the Students failed to plausibly plead that the Universities' retention of funds was unjust under the circumstances. The Students timely appealed. We consolidated these cases for review.

## II.   <u>Jurisdiction and Standard of Review</u>

The District Courts had jurisdiction under 28 U.S.C. § 1332(d)(2)(A). We have appellate jurisdiction under 28 U.S.C. § 1291.

We review a district court's ruling granting a motion to dismiss *de novo*. *Doe v. Univ. of the Scis.*, 961 F.3d 203, 208 (3d Cir. 2020) (citation omitted). We accept as true all factual allegations in the complaint and ask whether, viewing those facts in the light most favorable to plaintiffs, they are entitled to relief. *Id.* (citation omitted). The question for us is "'not

whether [] plaintiff[s] will ultimately prevail but whether [they are] entitled to offer evidence to support the claims.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

## III.   <u>Discussion</u>

The crux of the Universities' argument on appeal is that because the FRAs are "express, integrated contract[s]" that "specifically govern[] tuition, fees, educational services, and refunds," they preclude the Students from bringing either implied contract or unjust enrichment claims under Pennsylvania law.  Pitt Answering Br. 15; *see also* Temple Answering Br. 12-13 (similar).  Should we disagree, they also contend the Students' claims are not sufficiently pleaded and their damages are not cognizable.  We will therefore address below (A) whether the FRAs govern the Universities' obligations and thus preclude the Students' claims; (B) if not, whether the Students have sufficiently pleaded breach of contract or (C) in the alternative, unjust enrichment; and (D) whether damages are cognizable.

A.   <u>The Financial Responsibility Agreements Function as Promissory Notes, Not Integrated Contracts Covering the Universities' Obligations</u>[5]

---

[5]  The District Courts conducted their analyses considering the FRAs but reaching the same conclusion independently of them based on the Courts' views of the merits of the Students' claims.  That raises serious questions about whether the District Courts' consideration of the FRAs was

_____

proper because the FRAs were attached to, or in Temple's case, referenced by URL, in the Universities' motions to dismiss, but not attached to or expressly referenced in the Students' Complaints.  On a motion to dismiss, a district court may only consider an "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on that document," *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993), but otherwise it should convert the motion to dismiss into a motion for summary judgment under Federal Rule of Civil Procedure 12(d).

Here, the Universities contend that the Complaints are based on the FRAs, and no doubt, those documents relate to the Students' agreements to pay fees and tuition.  But the FRAs do not make an appearance in the Complaints themselves.  Nor, as we have interpreted the FRAs, do the Students' Complaints depend upon them.  Thus, the District Courts' consideration of the FRAs may have contravened Rule 12(d) and may have contributed to the decisions they reached to grant the Motions to Dismiss—decisions we reverse today.

Nevertheless, while likely erroneous, we do not address the procedural propriety of the District Courts' consideration of the FRAs because the Students' objections were forfeited: the Temple Students, for their part, challenged only the relevance of the FRAs before the District Court, not the propriety of their consideration in a 12(b)(6) context, *see Garza v. Citigroup, Inc.*, 881 F.3d 277, 284 (3d Cir. 2018) ("It is well established that arguments not raised before the District Court are waived on appeal.") (citations omitted), and the Pitt Students recited that argument in the District Court, but forfeited it on appeal by raising the issue in passing without "squarely argu[ing] error."  *Wyeth & Bro. Ltd. v. CIGNA*

We begin with whether the FRAs cover the full extent of the Universities' obligations to provide educational services, and thus foreclose the Students' implied contract and unjust enrichment claims.  As we explain below, they do not: the FRAs function as promissory notes that detail only the Students' obligations to pay tuition and do not set forth the Universities' corresponding obligations.  The plain text of the FRAs compels this reading, and the Universities' responses to the contrary are unavailing.

The FRAs' text obliges specific actions by the Students, but not by the Universities.  Virtually every sentence in the FRAs is an "I" statement, committing the student signor, for example, to pay for courses for which s/he is registered; to assume responsibility to drop classes that s/he does not plan to attend; and to acknowledge the University's right to cancel registration for nonpayment and report delinquent debt.  Pitt's FRA is also instructively self-titled "Promissory Note."  Pitt App. 53.

The Universities counter with three arguments, none of which is persuasive.  First, they contend that the FRAs intermittently reference "registration," "classes," "educational services," and the like,[6] and that these phrases are intentionally

_____

*Intern. Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997); *see also Prometheus Radio Project v. FCC*, 824 F.3d 33, 53 (3d Cir. 2016) (considering argument "relegated to a footnote" to be forfeited).

[6] *See, e.g.*, Temple App. 11 ("I acknowledge that by registering for classes at Temple University, I agree to pay all assessed tuition and fees . . . ."); Pitt App. 53 ("I further understand . . . that my . . . acceptance of these terms constitutes a Promissory

open-ended to provide the Universities with flexibility.  But the FRAs' structure—like all promissory notes, detailing one party's financial obligations—belies this interpretation.  These undefined, one- to two-word phrases simply add context to the Students' payment obligations and can hardly be said to delineate the full scope of the Universities' obligations in exchange for the Students' tuition and fee payments.

Second, the Universities point out that where an express contract exists, an implied contract is cognizable only where it is "entirely unrelated to the express contract."  *ITT Fed. Support Servs., Inc. v. United States*, 531 F.2d 522, 528 & n.12 (Ct. Cl. 1976).  Hence, they contend: because the FRAs reference "tuition," "fees," and "refunds," and the Students posit the existence of an implied contract, the breach of which would result in a partial refund, it must follow that the contracts are not "entirely unrelated."  Pitt Answering Br. 21; Temple Answering Br. 26-28.

But the Universities misconstrue the import of the "entirely unrelated" test: while that language is used to describe the relationship between fully integrated, express contracts and implied-in-fact contracts, it does not foreclose an implied contract claim based on a daisy chain of inferences that the Universities rely on here by linking the implied contract to the express one.  Instead, it asks whether there is a conflict between an express contract and the alleged implied contract.  *See ITT*, 531 F.2d at 528 ("To be entirely unrelated to the

---

Note Agreement (i.e., a financial obligation in the form of an educational loan . . . ) in which the University of Pittsburgh is providing me educational services . . . and I promise to pay for all assessed [costs].").

express contract, the implied contract would at the least have to require . . . some duties different from those under the formal agreement."). In other words, *de minimis* conceptual overlap between an express contract and an implied contract is not enough for the former to preclude the latter. *See Baer v. Chase*, 392 F.3d 609, 617 (3d Cir. 2004) ("The existence of an express contract . . . does not preclude the existence of an implied contract if the implied contract is distinct from the express contract.") (citations omitted).

Here, the fact that the express contracts—the FRAs—discuss tuition and fee obligations in the ordinary course of registration does not preclude the Students either from asserting breach of an implied contract based on an alleged university obligation (to provide in-person classes and services) not addressed in the FRAs, or from seeking damages in the form of a partial tuition or fee refund. *See Jones v. Adm'rs of the Tulane Educ. Fund*, 51 F.4th 101, 118 (5th Cir. 2022) (concluding FRA was not preclusive of students' claims as it "only address[ed] refunds that follow from the *Students'* desire to renege on the tuition contract; it d[id] not address refunds that follow from [the university's] failure to perform its end of the tuition contract").

Third, Pitt (only) argues that its integration clause—affirming that the FRA "constitutes the entire agreement between the parties with respect to the matters described"—precludes the Pitt Students' implied contract claim. Pitt App. 54. But by its terms, the clause applies only to "matters described" in the FRA, and the FRA does not address the methods of instruction or types of services the Universities must provide. *Id.*; *cf. Ninivaggi v. Univ. of Del.*, 555 F. Supp. 3d 44, 49-50 (D. Del. 2021) (Bibas, J., sitting by designation) ("But the integration clause limits its own reach to 'the matters

15

described' in that section of the catalog—the mechanics of 'Costs, Billing, and Financial Aid.' . . . It does not purport to address methods of instruction (like in-person classes) and thus does not make the contract fully integrated. So that is no bar to implying other terms.").

As the Universities' objections are unavailing and the FRAs function as promissory notes, not integrated contracts laying out the Universities' obligations, there is no express contract precluding the Students' implied contract or unjust enrichment claims.  We therefore proceed to consider if each of those claims is sufficiently pleaded.

> B.   <u>The Students Have Plausibly Alleged Breach of an Implied Contract</u>

We begin with the Students' implied contract claims and will first address the availability of this theory in the student-university context under Pennsylvania law, before turning to Students' tuition and fee claims in this case.

> 1.   *Implied Contract Claims in this Context*

As a general matter, in Pennsylvania, "[a] contract implied in fact is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from acts in the light of the surrounding circumstances."  *Elias v. Elias*, 237 A.2d 215, 217 (Pa. 1968); *see also Ingrassia Constr. Co. v. Walsh*, 486 A.2d 478, 483 (Pa. Super. Ct. 1984) (holding that implied contracts may arise where the circumstances, including "the ordinary course of dealing and the common understanding of men, show a mutual intention to contract") (citation omitted).  But the Universities contend that

Pennsylvania has displaced this general rule with "a particularized body of law" in the student-university context that "require[s] a showing of a definite, specific, and identifiable written promise." Pitt Answering Br. 1-2; *see* Temple Answering Br. 12 (similar).; *see also* Ass'n of Independent Colleges and Univers. of Pa. Amicus Br. 12-15.

We are not convinced. The Universities rely on *Swartley v. Hoffner*, 734 A.2d 915 (Pa. Super. Ct. 1999), but their reliance is misplaced. In *Swartley*, the Pennsylvania Superior Court rejected a plaintiff's claim that her university breached its contract to educate her and acted arbitrarily in denying her doctoral degree. *Id.* at 917-21. In so doing, it reasoned that because Pennsylvania does not recognize "'a general cause of action for educational malpractice, whether framed in terms of tort or breach of contract, where the allegation is simply that the educational institution failed to provide a quality education,'" the plaintiff could not allege a general failure to educate untethered to "written policies of the university." *Id.* at 918-19 (quoting *Cavaliere v. Duff's Bus. Inst.*, 605 A.2d 397, 403 (Pa. Super. Ct. 1992)). But the Court did not wholly exempt universities from the hornbook rule that contracts may be implied in fact. *See* Restatement (Second) of Contracts § 4 (Am. Law. Inst. 1981) ("A promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct."). Put differently, it did not preclude breach of contract claims by students who, unlike Swartley, allege specific promises their universities broke—even if those promises have not been reduced to writing.[7]

---

[7] We reject the Universities' assertion that the Students' tuition claims amount to no more than educational malpractice claims. The Students' claims are not that the education they

Indeed, both before and after *Swartley*, Pennsylvania courts have recognized that students may bring breach of contract claims for "specific undertakings" that a university promised but failed to deliver, such as a certain curriculum, accreditation, or degree.  *See, e.g.*, *Cavaliere v. Duff's Bus. Inst.*, 605 A.2d 397, 404 (Pa. Super. Ct. 1992) (observing that, in such cases, "the nature of the contractual undertaking and the breach thereof are clear and the plaintiff may be able to establish a cause of action against the offending institution"). They have also entertained implied contract claims by students against universities for failure to satisfy those types of commitments.  *See, e.g.*, *Gati v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 91 A.3d 723, 731 (Pa. Super. Ct. 2014) (recognizing, in expulsion case, that students may have a "reasonable expectation" based on "statements of policy . . . and the experience of former students" that they will receive a degree if they perform satisfactorily and meet their financial commitments) (quotation omitted); *McCabe v. Marywood Univ.*, 166 A.3d 1257, 1262 (Pa. Super. Ct. 2017) (considering claim that Marywood breached an implied promise set forth in

---

received was inadequate, but rather that the Universities failed to provide a specific type of education—live and in-person— that was essential to the bargain.  *Cf. Hernandez v. Illinois Inst. of Tech.*, 63 F.4th 661, 670 (7th Cir. 2023) ("[The student] asks us neither to rule that the online education he received was inadequate to prepare him to work in his chosen field . . . nor to review IIT's academic decisions about his performance . . . . Rather, [he] asserts that he received a 'materially different product' than what he bargained for."); *Ninivaggi*, 555 F. Supp. 3d at 52 ("[T]his is not a malpractice suit. The students claim not that their education was *bad*, but that it breached a promise to provide a specific type of education.").

its website and publications to provide a fully accredited nursing program before affirming dismissal because "Marywood was fully accredited at all relevant times").

In short, Pennsylvania has not jettisoned ordinary contract principles permitting implied contracts in cases where, as here, students allege that a university failed to perform a specific undertaking.  The question remains whether the Students here have adequately alleged that the Universities breached an implied contract to provide in-person education and services in exchange for (1) tuition, and (2) mandatory fees.

2. *The Adequacy of the Students' Pleadings Here*

i.  Tuition Claims

The Students' first breach of contract claim is based on the theory that their fundamental bargain with the Universities was for in-person education in exchange for tuition.  The District Courts concluded that the Students' allegations were insufficient to support this asserted contract because there was no "specific and identifiable" promise for in-person education that gave rise to a binding commitment—at most, the Students showed that they had a reasonable expectation of in-person instruction during "normal times."  Temple App. 17; Pitt App. 9.  But as discussed above, Pennsylvania law permits implied-in-fact contracts that may arise from "surrounding circumstances."  *Elias*, 237 A.2d at 217.  And here, the Students' Complaints highlight three university practices that could plausibly support an implied-in-fact contract: (1) the Universities' publications touting the benefits of the "on-campus experience"; (2) their longstanding pre-pandemic

tradition of in-person education; and (3) the separate marketing and pricing of online and in-person programs.

First, the Students cite to several university publications replete with references to in-person, on-campus instruction, as well as to the "campus experience." For example, Temple recruited students by claiming: "When you come to Temple, you also come to Philadelphia," and that students could "choose from a diverse range of activities on campus and in the surrounding city." Temple App. 112-13. It also advertised "experiential learning" opportunities, "state-of-the-art" facilities, and "hundreds of student organizations [that] thrive on campus." *Id.* at 111-12. Similarly, Pitt's website highlights the "full measure of [] benefits of Student Life at the University"; "[c]ollaboration with faculty and academic units"; "experiential education"; and "[s]tudent organizations" which "are an essential part of campus life." Pitt App. 39.

The Universities respond that these representations are only "generalized, aspirational statements," Temple Answering Br. 34, 36, that present "a subjective view of what campus life *may* be," Pitt Answering Br. 36 (quoting App. 9); they are not binding commitments. But viewed in context with the Students' payment of tuition and registration for in-person classes prior to the campus closures, these representations support a reasonable inference that in-person education and access to campus resources were among the benefits of the matriculation bargain. *Cf. Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 668-69 (7th Cir. 2023) (citation omitted) (concluding university's representations supported student's claim that "an identifiable contractual promise to provide an in-person, on-campus university experience in exchange for tuition and fees can be inferred from 'the facts and conduct' of [the university]"); *Gociman v. Loyola Univ. of Chicago*, 41

F.4th 873, 884-85 (7th Cir. 2022) (same); *Jones*, 51 F.4th at 114-15 (same); *Shaffer v. George Washington Univ.*, 27 F.4th 754, 764 (D.C. Cir. 2022) ("Viewing the pertinent language as a whole, . . . a reasonable person would have assumed that the Universi[ties] intended to bind themselves to providing in-person education in exchange for retaining Plaintiffs' entire tuition payments for traditional on-campus degree programs.") (quotation omitted).

Second, the Complaints describe the Universities' tradition of providing in-person education—including to the Students themselves prior to March 2020, which also supports the Students' implied contract theory. *See Crawford's Auto Ctr., Inc. v. Pa. State Police*, 655 A.2d 1064, 1066 (Pa. Commw. Ct. 1995) (explaining that intent to contract under Pennsylvania law may be informed by parties' "course of dealing") (citations omitted); *Ninivaggi*, 555 F. Supp. 3d at 51 ("This history, custom, and course of dealing, along with the school's statements, plausibly created an implied promise of in-person classes."); *Shaffer*, 27 F.4th at 764 (recognizing university's "historic practice" of on-campus education as supporting plausible allegation of implied contract for in-person instruction); *Jones*, 51 F.4th at 116-17 (same); *Gociman*, 41 F.4th at 884-85 (same).

The Universities counter that their prior practices of providing on-campus learning did not obligate them to "continue to do so indefinitely, without exception, in all circumstances, including during a pandemic." Pitt Answering Br. 42; *see* Temple Answering Br. 13-14 (similar). But rarely are contracts expressed in such terms. Whether it was impossible or impracticable for the Universities to continue holding in-person instruction during the second half of the Spring 2020 semester may speak to an impossibility defense,

which is not before this Court, but it does not speak to the parties' understanding on formation of the contract. *See* Restatement (Second) of Contracts § 261 (impossibility defense); *Jones*, 51 F.4th at 117 (declining to reach impossibility defense not raised by university).

Third, the Students point out that online education is a product separate and distinct from in-person education and is typically offered at a lower cost. Temple urges us to reject any inference based on its price disparities because it does not offer these less expensive online counterparts for all their in-person programs. But the lesser number of online offerings is neither here nor there. The point is that the Students have plausibly alleged they paid a "premium" for in-person education by asserting that "[t]he costs incurred for having an online only program [are] significantly lower than the costs and overhead necessary to provide classes and services on campus and in person," Pitt App. 48; *see* Temple App. 115-16, and therefore, in-person education was key to the bargain.

To be clear, not every benefit touted by a university gives rise to a contractual commitment. The specifics of course work—like instructors, class offerings, room assignments, and degree requirements—are well within universities' discretion and may be changed consistent with their contractual obligations. Though well understood given the nature of the services universities provide, many universities even make this explicit in reservation of rights provisions.[8]   *See, e.g.*,

---

[8] That is not to say such provisions necessarily extend, as a matter of law, to transitions to online education. While some might specifically address emergencies or other *force majeure* events, others are narrower and thus do not, "as a matter of law," allocate "the entire financial consequences of

*Cuesnongle v. Ramos*, 713 F.2d 881, 885 (1st Cir. 1983) ("The University reserves the right to revise or change rules, charges, fees, schedules, courses, requirements for degrees and any other regulations affecting students whenever considered necessary or desirable."). So, too, must Students anticipate adjustments in campus life: buildings undergo construction, programs face budget cuts, and previously "undefeated" sports teams falter. *See Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998) ("Not every dispute between a student and a university is amenable to a breach of contract claim[.]"). Even a university's ratings, rankings, and reputation are expected to fluctuate with normal competition in the marketplace. *See United States v. Porat*, No. 22-1560, 2023 WL 5009238, at *6 (3d Cir. 2023). Absent, for example, deceit, those changes would hardly give rise to contractual liability. Nothing in our opinion today attaches new legal significance to these realities. Our holding, rather, is a narrow one: that at the pleading stage, the Complaints' allegations of frequent references to in-person instruction in university publications, the schools' tradition of in-person instruction, and their different marketing and price structure for online programming support a reasonable inference that the parties

---

the pandemic change to online classes to the students." *Shaffer*, 27 F.4th at 764-65. Temple's limited reservation of rights provision is in the latter category. *See* Temple University, *2019-2020 Undergraduate Bulletin* 13, https://bulletin.temple.edu/archives/2019_2020_Undergraduat e_Bulletin.pdf (last visited July 14, 2023) ("The information in this [Course] bulletin is subject to change" including "the status of policies, programs, descriptions of curricula, or other information in this bulletin.").

impliedly contracted for in-person education, and that is sufficient to state a claim for breach of contract.

### ii. Fee Claims

We turn next to the Students' claims that the Universities breached their obligation to provide certain services and facility access in exchange for the Students' payment of particular fees. The Students' fee claims fall into three categories, which we address seriatim: (1) Pitt's housing and dining fees; (2) Pitt's mandatory fees; and (3) Temple's single "University Services" fee.

### a. Pitt Housing and Dining Fees

Beginning with Pitt housing and dining fees, which were not refunded for Students who moved out after April 3, 2020, Pitt observes that the Students have not alleged that any named class representative actually paid such fees. We agree, and because in class actions, at least one class representative must have experienced a concrete injury for each asserted claim, we will affirm the dismissal of the Pitt Students' housing and dining fee claims. *See Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 359 (3d Cir. 2015) ("In the context of a class action, Article III must be satisfied by at least one named plaintiff.") (internal quotation marks and citations omitted); *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)

(standing analysis must be tailored to the "type of relief sought") (citation omitted).[9]

### b. Pitt Mandatory Fees

Turning to Pitt's mandatory fees, although the University contends that the Students have "fail[ed] to identify any definite, specific, and identifiable promise connected to these fees," Pitt Answering Br. 37, the Students' Complaint is replete with specific allegations.  Distilled, the Students allege that they paid a total of $545 per semester for (1) a student activity fee that covered access to undergraduate programs and services, including a Student Radio and Student Organization Resource Center; (2) a wellness fee that covered access to Student Health Services—a campus facility staffed by medical doctors—, campus recreation facilities, and intramural sports; (3) a computing and network services fee that covered upgrades to university computer facilities and equipment; and (4) a security, safety, and transportation fee that covered access to on-campus transportation services.  The Students further allege that during the pandemic, the University closed several of the facilities and services that these fees were intended to cover without refunding any portion of the fees.

No doubt, further factual development is required to ascertain the scope of each fee, what specific services were terminated, and for how long.  For present purposes, however, we must take as true the factual allegations in the Complaint

---

[9] The District Court may consider in the first instance whether to grant Pitt Students further leave to amend their Complaint to attempt to establish standing to recover those expenses.  *See* Fed. R. Civ. P. 15(a)(2) (providing for leave to amend "when justice so requires").

and draw all reasonable inferences in the Students' favor. *Univ. of the Scis.*, 961 F.3d at 208 (citation omitted). When we do, the Students have adequately alleged that the services and access to campus facilities that the individual fees were intended to cover were at least partially terminated, so the Students may be owed a refund. *See Jones*, 51 F.4th at 114 ("Students plausibly allege that they paid for services that Tulane failed to provide and that [they] may be entitled to a partial refund.").

c.  Temple  University  Services
Fee

Finally, as to the third category of fee claims, Temple's single "University Services fee" was intended to cover "[f]unding for state-of-the art computer equipment and technologies . . .; [a]ccess to all student activities, events, and recreational facilities; [e]xpansion and maintenance of recreational and academic facilities . . . ; and [a]vailability of basic student health and treatment services." Temple App. 102. While the Temple Students allege that they "lost the benefit of the services for which these fees had been paid," yet received no refund, *id.* at 103, Temple highlights that its Tuition and Fees policy expressly identifies this fee as "non-refundable" and dependent solely on a student's credit hours, not on how often a student actually uses these services. Temple Answering Br. 2. But the term "non-refundable" gives notice to the Students that they will not be refunded if they choose not to use the services; it does not necessarily entitle the University to retain the fees if the services are unavailable altogether. Said another way, labeling a fee as non-refundable does not, on its face, excuse wholesale nonperformance. After all, "[i]t stretches reality that the Students agreed to pay money for a service not delivered," *Jones*, 51 F.4th at 114 (finding "non-

26

refundable" designation non-determinative), so we cannot say the Temple Students' fee claim fails as a matter of law.

\* \* \*

In sum, the Students have adequately pleaded their implied contract claims as to tuition in exchange for in-person education, Pitt's mandatory fees, and Temple's University Services fee—but not as to Pitt's housing and dining fees.

C.    The Students Have Adequately Pleaded Unjust Enrichment in the Alternative

We next consider whether the Students have sufficiently pleaded unjust enrichment.  Although Pennsylvania law bars unjust enrichment claims when a contract—express or implied—governs the parties' relationship, *see Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987), the Federal Rules of Civil Procedure permit such claims to be pleaded in the alternative where, as here, the existence or applicability of a contract is in dispute, *see* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

To state a claim for unjust enrichment under Pennsylvania law, a plaintiff must allege that (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated that benefit; and (3) the defendant retained the benefit under circumstances where it would be inequitable to do so without payment of value.  *WFIC, LLC v. LaBarre*, 148 A.3d 812, 819 (Pa. Super. Ct. 2016).  As the first two elements here are undisputed, the question for us is whether the Students have adequately alleged it was unjust for the Universities to retain their tuition and fees in full.

That they have.  The Students allege that the Universities retained considerable cost savings—at Students' expense—by transitioning to remote learning.  While the Universities, joined by *amici* American Council on Education, contend that they did *not* profit from the pandemic—and to the contrary, "incurred tremendous and unexpected costs," American Council on Educ. Amicus Br. 9—we will not resolve that factual question at the motion-to-dismiss stage.  *See Shaffer*, 27 F.4th at 769 ("[D]etermining whether the transition to online learning resulted in a net enrichment to [the universities] is a fact-intensive question inappropriate for resolution at the motion-to-dismiss stage.") (citation omitted).

Nor will we accept the Universities' invitation to affirm based on the correctness of their decisions to shut down campus.  The Students do not claim it was unjust for the Universities to decide to move classes and services online, but, having done so, that it was unjust for the Universities not to refund their tuition or fees even partially.  And they may be right if they can prove their allegations because the law here tracks common sense: "If the school saved money by substituting online for in-person classes, it might have to give those savings back to the students."  *Ninivaggi*, 555 F. Supp. 3d at 53.  The Students' allegations are thus sufficient to survive a motion to dismiss.

### D.   The Students' Asserted Damages are Cognizable

Finally, according to the Universities, the Students' claims should be dismissed because "[n]o objective methodology could reasonably calculate the difference in value between in-person and online instruction" and inherently speculative damages are not cognizable under Pennsylvania law.  Temple Answering Br. 50; *see* Pitt Answering Br. 48

(similar); *see generally Stevenson v. Econ. Bank of Ambridge*, 197 A.2d 721, 727 (Pa. 1964) (restriction on speculative damage awards) (citations omitted).   In Pennsylvania, however, damages are speculative "only if the uncertainty concerns the *fact* of damages, rather than the *amount*." *Pashak v. Barish*, 450 A.2d 67, 69 (Pa. Super. Ct. 1982) (citation omitted); *see also Carroll ex rel. Burbank v. Philadelphia Hous. Auth.*, 650 A.2d 1097, 1100 (Pa. Commw. Ct. 1994) ("[S]ummary judgment is improperly granted solely on the basis that the amount of damages is indefinite.").

Here, the Students have adequately pleaded damages. Not only do they allege that they did not receive the type of education that they purportedly bargained for, which costs more and comes with different benefits than online learning, including "the opportunity for collaborative learning and in-person dialogue, feedback, and critique," for which they paid; they also allege that they did not receive specific university services while the campuses were shut down.   Pitt App. 41. We join the D.C. Circuit in holding that such allegations, if proven, would give rise to "cognizable damages."   *Shaffer*, 27 F.4th at 765.

## IV.   <u>Conclusion</u>

For the foregoing reasons, we will affirm the dismissal of the Pitt Students' housing and dining fee claims, reverse the dismissal of all other claims, and remand for further proceedings.